**TREE FARM DEVELOPMENT CORPORATION**

v.

**The UNITED STATES.**

**No. 173–77.**

United States Court of Claims.

Oct. 18, 1978.

Christopher H. Little, Washington, D. C., attorney of record, for plaintiff; Edward J. Regan, Eustace T. Pliakas, Tillinghast, Collins & Graham, Providence, R. I., Stefan M. Lopatkiewicz, Schnader, Harrison, Segal & Lewis, Washington, D. C., and Harry Downs, Cambridge, Mass., of counsel.

Sandra P. Spooner, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant; Barbara Sarshik and Don Alexander, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND .PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge:

This contract case is before this court on cross motions for summary judgment. There is no genuine issue as to any material facts. After a careful review of the briefs, numerous exhibits, and oral argument of the parties, we grant defendant's motion.

The case concerns the procedure for obtaining a federal guarantee for the financing of the development and construction of a new community, "Tree Farm," to be located near Pensacola, Florida. Plaintiff, Tree Farm Development Corporation (hereinafter sometimes referred to as Tree Farm or plaintiff), filed an application with the New Community Development Corporation (hereinafter referred to as NCDC), a corporation within the Department of Housing and Urban Development (hereinafter referred to as HUD), seeking assistance in the form of a guarantee of loans Tree Farm might obtain to finance the project. Communication between Tree Farm and NCDC

and consideration of Tree Farm's application continued over a period of time until it was announced that the Secretary of the Department of Housing and Urban Development had suspended all consideration of proposals for loan guarantee assistance. The suspension has not been lifted, and plaintiff has filed suit in this court alleging breach of an implied contract and seeking damages in the amount of $729,000, representing its preparation and maintenance costs as well as the application fee paid when it submitted its proposal.

The facts necessary for an understanding of the issues involved are stated in the briefs filed by the parties. In essence, Congress passed the New Communities Act of 1968, Title IV of the Housing and Urban Development Act of 1968, 42 U.S.C. §§ 3901–14 (1970), to foster the planned development of new communities as a means of improving general living conditions as well as increasing the supply of housing. One of the forms of assistance authorized by Title IV was a guarantee by the Secretary of HUD, backed by a pledge of the full faith and credit of the United States, of payment of the principal and interest of obligations issued by private new community developers. 42 U.S.C. § 3902 (1970). This assistance was a response by Congress to the difficulties encountered by developers in obtaining adequate financing at moderate costs.

Title IV was largely supplanted in 1970 by the enactment of Title VII of the Housing and Urban Development Act of 1970, Pub.L. No. 91–609, 84 Stat. 1791, *codified at* 42 U.S.C. §§ 4501–32 (1970). Section 729 of Title VII created within HUD a corporate body known as the Community Development Corporation (hereinafter referred to as CDC). The CDC, later renamed the New Community Development Corporation (NCDC),[1] was to carry out its functions under the direction and supervision of the Secretary of HUD. In addition to stating that CDC would perform such "functions, powers and duties as the Secretary may prescribe from time to time," section 729 provided that the CDC was to exercise the "functions of the Secretary with respect to guarantees and loans in aid of new community development."

Under section 712 of Title VII, 42 U.S.C. § 4513(a) (1970), a program for the development of a new community is eligible for assistance only if the Secretary determines that the program:

(1) will provide an alternative to disorderly urban growth, helping preserve or enhance desirable aspects of the natural and urban environment or so improving general and economic conditions in established communities as to help reverse migration from existing cities or rural areas;

(2) will be economically feasible in terms of economic base or potential for economic growth;

(3) will contribute to the welfare of the entire area which will be substantially affected by the program and of which the land to be developed is a part;

(4) is consistent with comprehensive planning, physical and social, determined by the Secretary to provide an adequate basis for evaluating the new community development program in relation to other plans (including State, local, and private plans) and activities involving area population, housing and development trends, and transportation, water, sewerage, open space, recreation, and other relevant facilities;

(5) has received all governmental reviews and approvals required by State or local law, or by the Secretary;

(6) will contribute to good living conditions in the community, and that such community will be characterized by well balanced and diversified land use patterns and will include or be served by adequate public, community, and commercial facilities (including facilities needed for education, health and social services, recreation, and transportation) deemed satisfactory by the Secretary;

1. Pub.L. No. 93–383, § 803(a)(1), 88 Stat. 725 (1974).

(7) makes substantial provision for housing within the means of persons of low and moderate income and that such housing will constitute an appropriate proportion of the community's housing supply; and

(8) will make significant use of advances in design and technology with respect to land utilization, materials and methods of construction, and the provision of community facilities and services.

Further, section 716(a) of Title VII, 42 U.S.C. § 4517(a) (1970), provides:

No guarantee or loan shall be made under this part unless the Secretary has determined that the new community development program represents an acceptable financial risk to the United States, taking into consideration (1) the financial and security interests of the United States, including the manner in which the developer proposes to finance and schedule land acquisition, land development, and marketing, and (2) the public purposes of this part and the special problems involved in financing new communities, including (i) the large amount of initial capital required to finance sound new communities, (ii) the extended period before initial returns can be expected and (iii) the irregular pattern of cash returns characteristic of this type of development.

On March 19, 1971, and effective March 1, 1971, the Secretary delegated to the CDC his functions, duties, power, and authority with respect to assistance under Title VII. 36 Fed.Reg. 5304 (1971). In general, Title VII was administered much as Title IV had been; and since many of the new forms of assistance authorized by Title VII were never implemented, the main emphasis remained on Government guarantees of developers' obligations.

On July 31, 1971, HUD published proposed regulations for implementation of the Title VII program. 36 Fed.Reg. 14205 (1971). The proposed regulations attempted to establish preapplication and application procedures designed to obtain sufficient information to make the determina-

tions required by sections 712 and 716, *supra*. The process was broken down into several stages, successively requiring more detailed information from the applicant and more detailed review and processing by the NCDC staff. The initial contact between HUD and a developer was generally informal, consisting of a meeting with the general manager of NCDC or his representative to discuss the developer's proposals. 36 Fed.Reg. 14212 (1971). In the next and first formal step of processing, a formal preapplication proposal dealing in summary form with the new community, financial, and economic criteria of the program would be submitted to the general manager. 36 Fed.Reg. 14212 (1971). Section 32.22(c) of the proposed regulations provides that after reviewing the preapplication proposal, the general manager should take one of four actions:

(1) state his willingness to consider an application; or

(2) state his willingness to consider an application, indicating the need for specific changes in the project;

(3) recommend the resolution of certain critical problems before proceeding with an application; or

(4) discourage an application, indicating the aspects of the proposal which do not appear to meet the requirements of the Act.

The proposed regulation goes further stating: "Acceptance of an application does not constitute or imply an assurance of eventual approval."

After receiving the findings of the general manager as to his preapplication proposal, a developer was entitled to proceed with an application. Pursuant to section 32.23 of the proposed regulations, the application should include more specific information designed to support the determination that the new community, financial, and economic criteria have been met; and section 32.33 requires a remittance of a $10,000 non-refundable application fee. The regulations provide that if the Secretary makes a determination of eligibility for assistance, he may inform the applicant that he is prepar-

ed to enter into an agreement to guarantee the developer's obligations, subject to certain conditions. 36 Fed.Reg. 14213 (1971). If the offer of commitment is accepted by the applicant developer, HUD and the developer may enter into negotiations designed to lead to a formal agreement.

By letter of March 24, 1972, a Tree Farm representative requested a preapplication proposal meeting with representatives of CDC and on May 16, 1972, it submitted its formal preapplication proposal. By letter dated January 26, 1973, Samuel C. Jackson, General Manager of the Corporation, informed Tree Farm that:

Based on our review of your pre-application proposal, other materials submitted in support of your proposal and staff site reconnaissance, we are now prepared to consider an application for guarantee assistance under the Act.

Mr. Jackson's January 26, 1973, letter attached copies of the April 20, 1972, Draft Instructions for Loan Guarantee Assistance and the proposed regulations. Also, the following conditions to submission of the application were specified:

(a) remittance of a non-refundable $10,000 application fee;

(b) the giving of written notice within 30 days that an application would be prepared and submitted within six months of the date of Mr. Jackson's letter; and

(c) statement on the application or accompanying letter ("[i]n order to avoid any possible future misunderstandings") that:

"It is understood that:

"1. the willingness of the Department of Housing and Urban Development to consider this application in no way indicates any probable disposition of the application either favorable or unfavorable;

"2. such willingness is based upon a staff review of a pre-application proposal containing summary information only;

"3. such proposal has not been reviewed by, presented to, or discussed

with, the Board of Directors of the New Community Development Corporation which must act upon this application; and

"4. the disposition of this application will be determined not only by its merits but the merits of numerous other applications which are or may come under review and the limited statutory authority for guarantee assistance."

Tree Farm, by letter of January 29, 1973, officially informed Mr. Jackson that an application in accordance with the conditions of his January 26, 1973, letter would be prepared and submitted. On June 13, 1973, Tree Farm requested an extension of time in which to submit its application, and an extension until February 26, 1974, was granted. Throughout 1973 NCDC worked with Tree Farm to provide guidance and assistance in the preparation of its application. On February 25, 1974, Tree Farm formally submitted its application together with the application fee of $10,000. Additional material was submitted in March, as was the table of contents for the application.

As a matter of standard practice, the HUD Inspector General investigates certain aspects of the backgrounds of all principals involved in a potentially successful applicant for new community assistance. By letter of August 7, 1974, the general manager of NCDC informed the treasurer of Tree Farm of the results of the investigation, which indicated that one of the principals was not satisfactory. Tree Farm was advised that NCDC would not continue to review its application for guarantee assistance until a satisfactory solution of the stated problem was reached.[2]

On January 8, 1975, while the processing of plaintiff's application remained suspended, plaintiff was informed by NCDC that further consideration of all applications for Title VII loan guarantee assistance was being suspended pursuant to the decision of

---

2. At oral argument, counsel for both defendant and plaintiff seemed to agree that the problem of the tainted principal had been satisfactorily resolved by the time the general suspension of the loan guarantee assistance program occurred on January 14, 1975.

HUD Secretary James T. Lynn. This decision was publicly announced by HUD press release No. 75–11, dated January 14, 1975.

On March 31, 1977, plaintiff filed the present suit seeking damages in the amount of $729,000, representing its preparation and maintenance costs as well as the $10,000 application fee paid when it submitted its proposal. Since the commencement of this suit, HUD has offered to refund the $10,000 application fee to the plaintiff and all other developers like plaintiff who had consideration of their proposed development plan suspended on January 14, 1975. Plaintiff, however, has not requested or accepted the refund of its $10,000 application fee.

The parties' cross motions for summary judgment present us with the basic question of whether this court has jurisdiction to hear plaintiff's claim. Plaintiff, maintaining the existence of an implied-in-fact contract on the facts of this case or under the principles established in *Heyer Products Co. v. United States*, 140 F.Supp. 409, 135 Ct.Cl. 63 (1956), argued this court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491 (1970). Defendant, denying the existence of any contract with the plaintiff, whether express or implied, contends this court lacks jurisdiction to consider plaintiff's claims under 28 U.S.C. § 1491 (1970). Alternatively, defendant argues, the court lacks jurisdiction because the agency involved in this suit (NCDC) is a non-appropriated fund activity, citing *Kyer v. United States*, 369 F.2d 714, 177 Ct.Cl. 747 (1966), *cert. denied*, 387 U.S. 929, 87 S.Ct. 2050, 18 L.Ed.2d 990 (1967); *Novid Co. v. United States*, 535 F.2d 5, 210 Ct.Cl. 1 (1976); *Interdent Corp. v. United States*, 488 F.2d 1011, 203 Ct.Cl. 296 (1973). Since we find there never was a contract between the plaintiff and the United States, we hold for the defendant without reaching its non-appropriated fund activity contention.

■ The jurisdiction of the court is conferred by the Tucker Act, 28 U.S.C. § 1491 (1970), which permits the court

* * * to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. * * *

The limited statutory jurisdiction of the court cannot be expanded beyond the bounds established by Congress. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Carney v. United States*, 462 F.2d 1142, 1144, 199 Ct.Cl. 160, 162 (1972). The court specifically lacks jurisdiction in cases sounding in tort. *Somali Development Bank v. United States*, 508 F.2d 817, 205 Ct.Cl. 741 (1974). Although the court's jurisdiction over contractual matters extends to implied contracts as well as express contracts, it can adjudicate only contracts implied in fact and not contracts implied in law. *United States v. Minnesota Mutual Investment Co.*, 271 U.S. 212, 217–218, 46 S.Ct. 501, 70 L.Ed. 911 (1926); *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925); *Algonac Manufacturing Co. v. United States*, 428 F.2d 1241, 1256, 192 Ct.Cl. 649, 674 (1970).

■ In the instant case, plaintiff has not alleged a violation of the Constitution, a statute, or a regulation of the executive department. Nor does plaintiff rely upon our jurisdiction over express contracts. Instead, plaintiff relies upon this court's jurisdiction over implied-in-fact contracts. Specifically, plaintiff alleges that the suspension of the Title VII loan guarantee program was a "breach of defendant's implied in fact contract to consider plaintiff's application on its merits." Plaintiff contends there existed an implied-in-fact contract on the facts of this case (Mr. Jackson's January 26, 1973, letter stating CDC would "consider an application for guarantee assistance"; plaintiff's letter of acknowledgment of January 29, 1973, followed by the submission of the application on February 25, 1974; and plaintiff's payment of the $10,000 application fee on February 25, 1974) or, alternatively, under the principles of *Heyer Products Co. v. United States, supra.*

We find that plaintiff's claim falls outside the ambit of *Heyer* and its progeny.

*Keco Industries, Inc. v. United States,* 428 F.2d 1233, 192 Ct.Cl. 773 (1970); *Continental Business Enterprises, Inc. v. United States,* 452 F.2d 1016, 196 Ct.Cl. 627 (1971); *McCarty Corp. v. United States,* 499 F.2d 633, 204 Ct.Cl. 768 (1974). In *Heyer* the plaintiff alleged the bidding procedure followed by the Government was a mere sham to conceal an intention to let the contract to a favored bidder. There, the plaintiff's bid was the low bid but was rejected and the procurement contract was awarded to the seventh lowest bidder. Faced with the question of whether the court had jurisdiction over disappointed bidder cases, a majority of this court held:

> It was an implied condition of the request for offers that each of them would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted. * * * [140 F.Supp. at 412, 135 Ct.Cl. at 69.]

In *Keco Industries, Inc. v. United States, supra,* the court "held that the *Heyer* rule extended to *all procurement situations,* and that an aggrieved bidder who makes out a prima facie case of arbitrary and capricious action by the Government is entitled to a trial to prove the merits of his claim." *Continental Business Enterprises, Inc. v. United States, supra,* 452 F.2d at 1019, 196 Ct.Cl. at 634 [Emphasis supplied]. We emphasize the words "all procurement situations" because *Heyer,* even as clarified by *Keco Industries,* has not been extended beyond the disappointed bidder fact pattern. The limited scope of *Heyer* is manifest in our holdings in *Transcountry Packing Co. v. United States,* 568 F.2d 1333, 1337, 215 Ct.Cl. 390, 396 (1978), where we declined to extend *Heyer* "to allow a successful bidder to maintain a suit on the grounds that he should not have been awarded a contract" because he was nonresponsible, and in *Rob-*

ert F. Simmons & Associates v. United States, 360 F.2d 962, 175 Ct.Cl. 510 (1966), where we held the *Heyer* principles were not applicable to a case where all bids were rejected by the Government due to a change in procurement procedure.

Since plaintiff is not a disappointed bidder, but merely an applicant seeking governmental guarantees of the financing for its proposed development, it is manifest that plaintiff does not fall within the established parameters of the *Heyer* principles as outlined above. Indeed, the plaintiff concedes that we would be extending the rule of `the *Heyer* case if we applied it to the loan guarantee application involved in this case. Plaintiff's argument is that the rule of *Heyer* should be extended to cases like the one before us. We disagree and decline to extend the *Heyer* holding in this case. A further reason for our declining to extend the doctrine in this case is that the alleged facts of this case show a total absence of the arbitrary and capricious type of governmental conduct which the *Heyer* doctrine was designed to prevent. There is no allegation that other loan guarantee applications were given favorable treatment at the expense of Tree Farm's application. The facts alleged, viewed most favorably for plaintiff, establish just the opposite—that Tree Farm's application received an evenhanded treatment by the NCDC officials up until the Title VII loan guarantee program was suspended and afterward.[3]

Nor do we find the existence of an implied-in-fact contract on the facts of this case. In *Russell Corp. v. United States,* 537 F.2d 474, 210 Ct.Cl. 596 (1976); *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977), we stated:

> * * * For there to be an express contract, the parties must have intended to be bound and must have expressed

---

**3.** Plaintiff alleges HUD's suspension of further processing of all loan guarantee applications was arbitrary and capricious governmental action. Assuming *arguendo* this is so, *Heyer* and its progeny have never been applied where the Government rejects all bids. *Keco Industries, Inc. v. United States,* 492 F.2d 1200, 1205, 203

Ct.Cl. 566, 577 (1974); *Robert F. Simmons & Associates v. United States, supra.* The *Heyer* principles have been applied only to situations where the arbitrary and capricious governmental action results in one bidder prevailing over another (the disappointed bidder).

their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established. * * *

* *. * * * *

A contract implied in fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential, however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain. *The requirements of mutuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.* [*Id.* 537 F.2d at 481–482, 210 Ct.Cl. 608–609.] [Footnotes omitted; emphasis supplied.]

This court faced a situation analogous to the one presented by the facts of this case in *Cutler-Hammer, Inc. v. United States,* 441 F.2d 1179, 194 Ct.Cl. 788 (1971). There, seven industrial users of silver had filed applications pursuant to a Treasury Department regulation for the purchase of 7,734,-000 ounces of silver. Shortly after the applications were filed, the Treasury stopped selling silver at the fixed price established in the regulation and, instead, started selling silver under a competitive bid procedure. The plaintiffs in that case sought to sue the Government for breach of a contract to sell silver. However, this court held that the applications in *Cutler-Hammer* were mere applications and not an operative offer in the following language:

> In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention. *National By-Products, Inc. v. United States,* 405 F.2d 1256, 1264, 186 Ct.Cl. 546, 560 (1969). We find nothing in the language of the Regulation or the acknowledgment which could be construed as contractual in nature, by that standard. That is, nowhere

is there a *promise* on the part of the Government to sell even one ounce of silver at the price mentioned. Purchasers are simply invited to make "application" to buy certain quantities of silver at a price which will be *not less than* $1.29 +. * * * Sec. 24 of the Restatement Second, Contracts, Tentative Draft No. 1 (1964), defines an offer:

> "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."

It requires a distortion of plain English to infer that making an application in conformity with the terms of this Regulation would constitute an acceptance of an offer whereby the United States intended to bind itself. [*Id.* 441 F.2d at 1182–1183, 194 Ct.Cl. 794–795.] [*See also Primary Metal & Mineral Corp. v. United States,* 556 F.2d 507, 214 Ct.Cl. 90 (1977).]

We quote from *Cutler-Hammer* to show that invitations by the Government to file applications do not necessarily equal an operative offer, the acceptance of which will result in a binding contract.

In the present case, NCDC wrote to the plaintiff on January 26, 1973, stating

> Based on our review of your pre-application proposal, other materials submitted in support of your proposal and staff site reconnaissance, we are now prepared *to consider an application* for guarantee assistance under the Act. [Emphasis supplied.]

Along with this letter were sent a copy of the proposed regulations for the loan guarantee assistance program and instructions for filing an application. In addition, a number of conditions to the submission of an application were specified. The developer was specifically required to state on its application or accompanying letter "[i]n order to avoid any possible future misunderstandings":

> It is understood that:
>
> 1. the willingness of the Department of Housing and Urban Development to consider this application in no way indi-

cates any probable disposition of the application either favorable or unfavorable;

2. such willingness is based upon a staff review of a pre-application proposal containing summary information only;

3. such proposal has not been reviewed by, presented to, or discussed with, the Board of Directors of the New Community Development Corporation which must act upon this application; and

4. the disposition of this application will be determined not only by its merits but the merits of numerous other applications which are or may come under review and the limited statutory authority for guarantee assistance.

After carefully reviewing the above items, we find that they constitute a mere invitation by the Government to Tree Farm to submit an application for loan guarantees. As in *Cutler-Hammer*, it requires a distortion of plain English to infer that the plaintiff's making of an application in conformity with the above letter would constitute an acceptance of an offer whereby the Government intended to bind itself. The most that can be inferred from the January 26, 1973, letter to plaintiff, with attached regulations, instructions, and conditions, is that the Government was willing to *consider* an application from plaintiff which might eventually lead to a binding loan guarantee agreement. Nothing in the materials received by the plaintiff with the January 26, 1973, NCDC letter stated that the Government was to render a decision on the merits of the Tree Farm proposal. Indeed, consideration of the application in this case was initially suspended because one of the Tree Farm principals did not meet HUD requirements. Had that problem not been overcome by the removal of the tainted principal from Tree Farm, plaintiff's application would have received no further consideration by NCDC. Further evidence that NCDC was not binding itself in any way as to the ultimate disposition of plaintiff's application can be found in the January 26, 1973, NCDC letter. By the sheer number of conditions set forth, it is evident that merely because NCDC was willing to

consider plaintiff's application did not mean that NCDC was offering to contractually bind itself to make a disposition of the application on the merits rather than in some other manner.

Nor do we find the payment of the $10,000 application fee helpful to plaintiff's case, in view of the total absence of a meeting of the minds. Plaintiff knew that the fee was non-refundable and for the purpose of defraying the NCDC expenses incurred in considering the application. 36 Fed.Reg. 32.33 (1971). Part of the $10,000 was undoubtedly spent for that purpose for plaintiff's application had been under consideration by NCDC for approximately 11 months before the Title VII loan guarantee program was suspended. Despite this the Government has agreed to refund the entire $10,000 application fee.

## CONCLUSION

Since there is no implied-in-fact contract on the facts of this case or under the principles of *Heyer* and its progeny, the court lacks jurisdiction to consider plaintiff's claim. Accordingly, we grant defendant's motion for summary judgment, deny plaintiff's cross motion for summary judgment, and dismiss the plaintiff's petition.