## CITY OF KLAWOCK

v.

## The UNITED STATES.

### No. 134–80C.

United States Claims Court.

June 9, 1983.

---

William K. McInerney, Jr., Seattle, Wash., for plaintiff.

John W. Showalter, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

OPINION

HARKINS, Judge.

Plaintiff, City of Klawock (City), seeks $72,000 damages for breach of an alleged

contract with the Bureau of Indian Affairs (BIA) to settle plaintiff's claims for water furnished to a fish cannery operated by the Klawock Cooperative Association (KCA), an Indian Association organized under the Indian Reorganization Act of 1934.[1] After KCA's default in the revolving loan fund program, BIA in 1979 assumed control over its assets and arranged for operation of the cannery in 1979 through a lease with an unrelated Washington corporation. The case is before the court on defendant's motion for summary judgment. After consideration of the parties' submissions, without oral argument, defendant's motion is allowed, and the complaint will be dismissed.

Although plaintiff asserts the correspondence and its supporting affidavit establish the existence of a binding settlement agreement, there is no genuine issue as to material fact. To the extent that plaintiff's supporting affidavit can be construed to raise an implication that material facts may be in issue, such implication is overcome by uncontroverted documentary evidence relied upon by plaintiff. Accordingly, disposition by summary judgment is appropriate.

## FACTS

In 1969, KCA operated a fish cannery and used water supplied by plaintiff. KCA's operations largely were financed with loans made available through the revolving loan fund program administered by BIA.[2]

On or about June 27, 1970, a document, captioned "Water Purchase Contract," which purported to be for the sale and purchase of water to be used in the fish cannery run by KCA, was executed for both parties by Frank Peratrovich in his capacity as Mayor of Klawock and president of KCA. The contract obligated the City to deliver up to 9 million gallons of water per month to KCA at a price of $8,000 per year.

KCA failed to make timely payments to the revolving loan fund. BIA Area Director Clarence Antioquia on February 14, 1979, notified KCA it was in default and took control of its assets. At that time

KCA owed roughly $3.2 million to the United States and $500,000 to private lenders. In addition, Southeast Seafood Processors Inc. (SSPI), a corporation created to operate the cannery, 85 percent of the stock of which was owned by KCA, owed $1.7 million to the United States, and $500,000 to Peter Pan Seafoods, Inc. BIA arranged to continue operations for the 1979 fishing season through a lease executed April 17, 1979, with Peter Pan Seafoods for an annual rental of $120,000.

Shortly thereafter, plaintiff's attorney, A. Fred Miller, contacted David Case, an attorney in the Office of the Department of Interior's Alaska Regional Solicitor. He advised BIA that KCA had never paid for water received under the 1970 contract, and threatened that the water supply would be cut off unless a settlement agreement was reached. The two attorneys discussed ways to resolve the matter and avoid disruption of operations in the 1979 fishing season. By letter dated April 25, 1979, Miller confirmed that he was authorized to negotiate a settlement on the following basis: (1) an immediate payment of $16,000 representing water costs for the 1978 and 1979 seasons; (2) payment of the balance at a rate of $10,000 per year; and (3) payment of interest at a rate of 6 percent per annum on the outstanding balance.

On May 8, 1979, Miller and Case discussed the City's proposal over the telephone. Case told Miller that the proposal was acceptable if the following objectives were satisfied: (1) the present KCA council ratify the 1970 water contract; (2) the agreement made it clear that the debt was that of KCA and was not being assumed by BIA; and (3) that Peter Pan agreed to pay the $8,000 charge for 1978 and 1979. It was agreed that Miller should draft a settlement agreement and forward it to Case. On May 9, 1979, Case forwarded Miller's April 25, 1979, proposal to BIA's Regional Credit Officer, and reiterated the objectives given to

---

**1.** 25 U.S.C. §§ 476–477 (1976).

**2.** 25 U.S.C. § 470 (1976).

Miller in the May 8, 1979, telephone conversation.

On May 10, 1979, Miller forwarded a draft of a document captioned "Agreement Ratifying and Modifying Water Purchase Contract" (May 10 draft). The May 10 draft purports to be between the City and KCA. Section 1, captioned "Recognition of Debt," recites that KCA acknowledges an indebtedness in the amount of $72,000 for water purchases under the 1970 contract. Section 2, captioned "Payment of Indebtedness," provides that KCA would promptly pay to the City the $72,000 without deduction or set off, and that BIA would pay over to the City any funds deposited for payment with BIA, including any funds collected by BIA from any sources that receive benefits from water supplied under the 1970 contract. The May 10 draft had signature lines for the City as Seller, for KCA as Purchaser, and for approval by BIA.

On May 17, 1979, Miller reported to the City's Mayor (Al Macasaet) the status of negotiations with Case. This letter acknowledged that settlement negotiations had not been concluded and requested information as to the "council's reaction to the proposed settlement agreement."

On May 25, 1979, Case by letter responded to Miller's April 25th offer of settlement and memorialized their subsequent telephone conversations. The letter recited:

Because of certain ambiguities in the City's "Water Purchase Contract," I have requested that the other party to that contract, the Klawock Cooperative Association, ratify the contract (and the debt) and advised that the BIA would then sign an agreement on behalf of the Cooperative Association to make the $10,000 annual payments at 6 percent interest.

The BIA has, pursuant to its regulations, assumed responsibility for the operation of the Klawock Cooperative Association's and SSPI's fishing enterprises. Although this does not mean the United States has assumed liability for any of the Association's or SSPI's debts, the Bureau stands ready and able to meet the terms of the City's offer. The $16,000 will be paid "forthwith" upon the presentation of the City's 1978 and 1979 water bills to Peter Pan Seafoods * * *. The BIA will sign an agreement on behalf of the Association for the balance owing upon the reasonable assurance of either the Association or the City of the amount and validity of the debt.

On June 8, 1979, Case by letter submitted to Miller suggested changes by a mark-up on the May 10 draft, and a revised Section 2. Case requested Miller to complete the agreement in final form and to forward it to the BIA Area Director for approval. Case also stated that if for some reason it proves impossible to conclude the agreement, "the BIA is still open to a direct agreement with the City, provided the City can show reasonable evidence that the debt is due."

Early in July 1979, Miller learned KCA was reluctant to sign a settlement agreement, and he conveyed this information to Case and BIA's Area Credit Officer. Miller was told that BIA would sign on behalf of KCA.

On July 13, 1979, Miller forwarded to Case two copies of a draft agreement (July 6 draft), which had been signed on July 6, 1979, by the Mayor of Klawock. The July 6 draft did not contain the revisions Case had requested in his June 8, 1979, letter. Miller's July 13, 1979, transmittal letter noted that Case had indicated that he would want to add some language, and suggested that "it may be convenient under the circumstances to do so in a separate document." The July 6 draft was never signed by the BIA.

By letter dated August 7, 1979, Case forwarded a revised draft agreement (August 7 draft) to Miller which differed significantly from the previous drafts. The August 7 draft was to be a direct agreement between the City and the BIA acting on behalf of KCA. The August 7 draft deducted $24,000 from the total debt claimed, leaving a balance of $48,000, on the ground that claims for the first 3 years under the 1970 agreement were time-barred. Case stated in the transmittal letter:

Had the Klawock Cooperative Association agreed to resurrect the entire debt, the BIA would not have objected. However, acting on behalf of the Cooperative Association, we do not feel we can advise the BIA to recognize a time-barred debt as a legitimate claim.

On August 30, 1979, Miller notified Case that there had been a breach of good faith and that future "negotiations should be handled on the strictest formal basis because I no longer trust you." Miller asserted the City had a binding agreement with the BIA based on BIA's prior agreement to the terms of the City's original proposal. Miller stated that he would recommend that the City not accept the new terms offered by the BIA and that the City should assert all of its rights against all responsible parties.

On September 14, 1979, BIA's Regional Solicitor responded to Miller and ratified Case's actions. Miller was told that if the City did not accept the offer in the August 7 draft by September 24, 1979, it would be withdrawn.

On September 20, 1979, the time within which the City could accept the BIA's offer was extended until October 11, 1979. The City rejected the offer and did not execute a contract based on the August 7 draft. Peter Pan paid the water bills for 1978 and 1979 on October 1 and 9, 1979.

On February 15, 1980, the City instituted suit against KCA in the Superior Court for the State of Alaska, First Judicial District at Ketchikan, No. IKE–80–77 Civil. KCA did not appear or otherwise defend, and default judgment of $93,103.56 was entered on April 16, 1980.

On September 30, 1980, a stipulation and order of dismissal with an attached settlement agreement was filed in the United States District Court for the District of Alaska, case No. K–79–6 Civil. Pursuant to the settlement agreement with KCA and the Klawock Heenya Corporation, BIA withdrew its default in the revolving loan program and relinquished responsibilities for the affairs of KCA.

## DISPOSITION

Defendant's motion for summary judgment addresses plaintiff's claims in both Counts I and II. Count I alleged BIA was liable for KCA's breach of the 1970 water agreement; Count II alleged a breach of a settlement agreement between the City and BIA.

■ The claim in Count I is without merit, and plaintiff has not pursued this issue in its motion papers. When BIA took over operation of KCA's assets pursuant to the authority in 25 C.F.R. § 91.15 because of the failure to conform to the terms of the loan agreement, BIA did not assume any of the debts of KCA. The relationship between BIA and KCA in the revolving loan fund program, and under the loan agreement, is the routine commercial relationship that exists when a creditor exercises its rights against a defaulting debtor.[3]

With respect to plaintiff's Count II claim, there is no document, executed by the parties, that embodies a settlement and compromise between the parties. Plaintiff's claim is not supported by an express contract in writing. Plaintiff asserts, however, that the correspondence affirms the existence of an express oral contract, and that the conduct of the parties establishes a contract implied-in-fact.

■ For there to be an express oral contract, the evidence must show the parties intended to be bound and that they expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established. The requirements of mutuality of intent and lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract.[4]

---

3. *Hydaburg Coop. Assoc. v. United States,* 667 F.2d 64, 68 (Ct.Cl.1981).

4. *Tree Farm Dev. Corp. v. United States,* 218 Ct.Cl. 308, 585 F.2d 493, 499–500 (Ct.Cl.1978); *Russell Corp. v. United States,* 210 Cl.Ct. 596, 537 F.2d 474, 481–82 (Ct.Cl.1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977).

The facts in this case do not meet the standards for either an express oral contract or an implied-in-fact contract. Throughout the period of negotiations between February and August 1979, both attorneys recognized that any settlement they agreed upon in negotiations would have to be embodied in a written instrument, which in turn would be executed by officials of the City and of BIA. Both attorneys knew the process required approval by the City Council and by appropriate officials in BIA.

The affidavit of A. Fred Miller states that Case agreed, in the telephone conversations that preceded the May 10 draft, to the City's proposal and that "a settlement was reached on all major items." He admits, however, there may have been a few minor details to resolve.

Plaintiff reinforces its argument by reference to the May 25th letter in which Case stated "the Bureau stands ready and able to meet the terms of the City's offer." Plaintiff also quotes Case's June 8th letter which stated the proposed modifications to the May 10 draft "do not alter our agreement."

It is clear that when the May 10 draft was submitted, the attorneys had not reached a final express oral agreement. In the May 8 telephone conversation, BIA's representative insisted that, before the settlement could be agreed upon, the present KCA council ratify the 1970 water agreement in order to establish a valid recognition of the debt. This is reflected in the structure of the May 10 draft, which purports to be between the City as Seller and KCA as Purchaser, with BIA merely in the capacity as an approving signatory. Further, plaintiff's attorney acknowledges that

the settlement reached only "all major items" and that there were "a few minor details to resolve."

Case's May 9 letter to the regional credit officer shows that he did not consider the telephone conversations to that date to have resulted in a final settlement agreement. Miller's May 17 letter to the City's Mayor Macasaet shows that he did not consider the negotiations to have concluded in an agreement. He discussed the possibility that the settlement might not be concluded, that the City may want "to bring suit for amounts in addition to Eight Thousand ($8,000) Dollars per year," and asked to be told by telephone of the council's "reaction to the proposed settlement agreement." [5]

■ The May 25 letter from Case to Miller, cited by plaintiff establishes that BIA had not accepted the City's offer. The letter clearly makes acceptance of the City's offer contingent upon KCA's ratification of the outstanding debt. The June 8 letter from Case to Miller, also shows that any direct settlement agreement between the City and BIA was contingent upon a showing of "reasonable evidence that the debt is due." No contract can arise if the existence of the contract is conditioned upon the action of a third party, and that third party has yet to take the required action.[6]

■ The facts establish that the negotiations of the parties did not culminate in an agreement based upon an actual meeting of the minds. No implied-in-fact contract came into existence. Moreover, in negotiations where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied.[7]

---

**5.** The May 17, 1979, letter from Miller to Mayor Macasaet was not included in the supporting documentation of either party in the motion for summary judgment. It was exhibit No. 6 to plaintiff's pretrial submission, transmitted by letter dated May 5, 1981, in response to the Standard Pretrial Order on Liability (Rule 111), United States Court of Claims, filed by Trial Judge Bernhardt on Dec. 5, 1980. Under the Court of Claims Rules, responses to the standard pretrial order were submitted to the attorney of record and to the trial judge, but were not filed with the Clerk. The May 17, 1979,

letter is hereby filed with the Clerk and incorporated into the record of this case.

**6.** *American Gen. Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 587 F.2d 54, 58 (1978); *Colonial Metals Co. v. United States,* 204 Ct.Cl. 320, 494 F.2d 1355, 1359 (1974).

**7.** *DeMatteo Const. Co. v. United States,* 220 Ct.Cl. 579, 600 F.2d 1384, 1388 (1979); *American Gen. Leasing, Inc. v. United States,* 587 F.2d at 58; *Ship Const. & Trading Co. v. United States,* 91 Ct.Cl. 419, 456 (1940), *cert.*

■ Plaintiff seeks to raise the doctrine of equitable estoppel, citing *Emeco Indus., Inc. v. United States.*[8] The doctrine of equitable estoppel will be applied by this court in an appropriate case to prevent the United States from denying the existence of a contract.[9]

■ Plaintiff's attempted use of the estoppel doctrine is not permissible. It is essential, to hold that the United States is estopped, that the course of conduct or representations involved be made by officers or agents of the United States who are acting within the scope of their authority.[10] No contract with the United States is valid unless it is executed by an official with actual authority to bind the Government. One who purports to contract with the United States assumes the risk that the official with whom he deals is clothed with the actual authority to enter the contract alleged.[11]

It is plaintiff's burden to plead and prove such authority.[12] Plaintiff has failed to do either.

### CONCLUSION

Defendant's motion for summary judgment is allowed, and defendant shall collect its costs. Plaintiff's petition (now complaint) will be dismissed.

*denied,* 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941).

8. 202 Ct.Cl. 1006, 485 F.2d 652 (1973).

9. *Manloading & Management Assoc., Inc. v. United States,* 461 F.2d 1299 (1972); *Branch Banking & Trust Co. v. United States,* 120 Ct.Cl. 72, 98 F.Supp. 757 (Ct.Cl.), *cert. denied,* 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951); Claims Court General Order No. 1, Oct. 7, 1982.

10. *Emeco Indus., Inc. v. United States,* 485 F.2d at 657.

11. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Jackson v. United States,* 217 Ct.Cl. 25, 573 F.2d 1189, 1197 (1978).

12. *Kania v. United States,* 650 F.2d 264, 268 (1981); *Grismac Corp. v. United States,* 214 Ct.Cl. 39, 556 F.2d 494 (1977).