**INSTITUT PASTEUR**

v.

**The UNITED STATES.**

No. 730–85C.

United States Claims Court.

July 7, 1986.

James B. Swire, New York City, for plaintiff. Richard J. Barnes, Marla G. Simpson and Townley & Updike, of counsel.

Thomas J. Byrnes, Washington, D.C., with whom was Asst. Atty. Gen. Richard K. Willard, for defendant. Oscar A. Towler, III, of counsel.

## OPINION

MEROW, Judge:

This matter comes before the court on several pending motions. Defendant has filed two motions to dismiss, a motion for summary judgment and a motion for a protective order. Plaintiff has opposed defendant's motions and has filed a motion to compel document production.[1]

In this litigation, plaintiff, a not-for-profit research institution located in France, seeks to recover breach of contract damages and related relief from the United States. Plaintiff's complaint alleges the existence and breach of an express or implied contract with the United States concerning certain scientific materials it provided to research personnel at the National Cancer Institute (NCI), a part of the Department of Health and Human Services.

Defendant's motions set forth several defenses. Defendant asserts that plaintiff's complaint fails to state a cause of action for which relief can be granted and that no valid contract(s) exists such as to support jurisdiction in this matter under 28 U.S.C. § 1491. Also, it is asserted that even were any such contract(s) with plaintiff held to exist, jurisdiction would still be lacking because of a failure by plaintiff to comply with the Contract Disputes Act, 41 U.S.C. § 605(a) and (c).

### Facts

The facts required to resolve the limited issues raised by the pending motions are contained in the materials filed to date and are not in dispute.

Plaintiff alleges that since November of 1982 it has pursued various avenues of scientific research concerning the disease, first identified in 1981, of Acquired Immune Deficiency Syndrome (AIDS).

Shortly following the identification of AIDS, a number of causation theories were expressed, including discussion in 1982 by Harvard School of Public Health and NCI researchers of a possibility that a group of human T-lymphotropic viruses (HTLVs) are involved.

Plaintiff alleges that by no later than February 1983, its research had resulted in the isolation of a previously undiscovered virus from a patient with lymphadenopathy, an AIDS-related disease, and plaintiff named this virus, Lymphadenopathy Associated Virus (LAV).

Plaintiff asserts that in or about February of 1983 the head of its viral oncology unit, Dr. Luc Montagnier, initiated a series of communications and correspondence concerning AIDS research with NCI research personnel, including Dr. Robert C. Gallo, chief of the laboratory of tumor and cell biology. Several samples of the LAV strain virus were delivered by plaintiff to these NCI personnel for use in research. The record shows that Dr. Gallo had requested such scientific material from plaintiff.

For example, a letter dated April 25, 1983 from Dr. Gallo to Dr. Montagnier states as follows:

Dear Luc,

We have submitted your paper to Science for publication. It appears that all AIDS related papers will be published in May. Since your paper is in press and will be published shortly, I would like to get the RUB cell line and carry out a detailed comparison of the genome of the RUB

---

1. Defendant's time to file a final reply brief has not expired. By a letter dated June 27, 1986, plaintiff requested a prompt ruling in this matter. *But see* Rules 5(d), 7(b). However, the issues have been addressed by both parties in the briefing to date. Defendant has filed a separate reply under the order filed May 23, 1986. Accordingly, it is concluded that a decision can appropriately be rendered at this time, in accordance with Rule 1.

virus with other HTLV isolates. All this work will be on a collaborative basis, and we will send you our results as soon as they are ready. In addition, we will not give out this cell line to anybody without your permission. If you agree we would also like to carry out molecular cloning of RUB.* I shall appreciate it if you could let us know when we can expect the cell line.

Best regards.

> Sincerely yours,
>
> Bob /s/
>
> Robert C. Gallo, M.D.

PSS:tas

---

\* I understand if you don't want us to do this i.e. cloning—however, I would like to push you on the comparative studies. [Footnote handwritten.]

On September 15, 1983 plaintiff applied for a patent in the United Kingdom, Application No. 83.24.800, for a diagnostic test kit for the detection of antibodies in the blood of persons with AIDS and pre-AIDS conditions. Also on this date, Dr. Montagnier presented the results of plaintiff's research on the LAV isolates at a scientific conference held at Cold Spring Harbor, New York where NCI research personnel were also present.

On September 23, 1983, Dr. Mikulas Popovic, a visiting associate in NCI, signed a receipt prepared by plaintiff, as follows:

> Virus LAV1 produced by human T-lymphocytes n° I–232 deposited on July 15th, 1983 at the C.N.C.M.
>
> The virus LAV1 will be available subject to acceptance of the three following conditions:
>
> 1) The virus will be used by the recipient himself, exclusively, and only for the following research purposes (fill in):
>
> a) biological; b) immunological and c) nucleic acid studies.
>
> 2) It will not be used for any industrial purpose without the prior written consent of the Director of the Pasteur Institute.

3) The recipient agrees not to disseminate the virus in any form (to companies or other scientists) without the prior written authorization of the Director of the Pasteur Institute. The recipient is also informed that the virus LAV1 may constitute a potential biohazard.

---

> I AGREE TO ACCEPT two samples of virus LAV1 (Mkt–1B and JBB LAV) and anti-interferon sheep serum (2ml)
>
> DATE September 23, 1983
>
> NAME Dr. Mikulas Popovic
>
> SIGNATURE Mikulas Popovic /s/
>
> [Underscored is handwritten.]

Similar receipt forms setting forth guidelines for use are utilized by NCI when it transmits cell line samples to other laboratories.

On December 5, 1983 plaintiff applied for a patent in the United States, Application No. 558,109, for a diagnostic test kit for the detection of antibodies in the blood of persons with AIDS or pre-AIDS conditions, citing its British application for establishing priority.

On or about April 23, 1984 NCI research personnel, including Drs. Gallo and Popovic, together with Dr. Mangalasseril G. Sarngadharan, applied for patents in the United States related to a diagnostic test kit for the detection of antibodies in the blood of persons with AIDS or pre-AIDS conditions. As a result of these applications, U.S. Patent No. 4,520,113, entitled "Serological Detection of Antibodies to HTLV–III in Sera of Patients with AIDS and Pre-AIDS Conditions" was issued to the United States as represented by the Secretary of Health and Human Services, as assignee. License agreements have been negotiated with several companies for the production, use and sale of the diagnostic test kits covered by this patent with royalties to be paid to the United States. However, an interference proceeding is pending at the U.S. Patent Office, pursuant to 35 U.S.C. § 135, as a result of the pending prior test kit patent application filed by plaintiff. This interference proceeding will

resolve the question of priority of invention.

In early August of 1985, a series of meetings and communications took place between Dr. Raymond Dedonder, director of the Institute Pasteur, and high ranking personnel of the Department of Health and Human Services (HHS), including C. McClain Haddow, chief of staff. In these meetings, as set forth in Dr. Dedonder's introductory statement and closing remarks, plaintiff stressed its concern for public health and its desire not to interfere with current production of diagnostic kits. However, Dr. Dedonder asserted it to be an established fact that the virus responsible for AIDS was discovered by the group working at the Pasteur Institute, and claimed entitlement to a full recognition of this fact, including a right to a patent, so that its licensees could freely sell diagnostic kits in the United States with plaintiff gaining the financial returns. Plaintiff expressed its willingness to allow the present licensees of the United States government to continue to remain on the market, using the rights of the Pasteur Institute against royalties to be discussed.

On August 20, 1985, C. McClain Haddow, wrote to Dr. Dedonder as follows:

This letter is in the spirit of affirming our resolution and our common goal in working together with you and the Pasteur Institut in overcoming AIDS.

At our meeting of August 7, and your meeting of August 6, with members of the department, a number of extremely serious representations were made. We would appreciate your providing us with the representations and supporting documentation in as much detail as you choose, in writing, so that we may consider them on a timely basis with respect to your September 6 time frame.

We can assure you that consideration will be thorough and fair to all concerned.

By letter dated August 20, 1985, Dr. Dedonder forwarded to HHS a selection of documents including prior correspondence with Dr. Gallo, the published proceedings of the September 15, 1983 Cold Spring Harbor, New York meeting, and copies of its patent applications in the United Kingdom and the United States. Also included was a copy of the above-quoted September 23, 1983 receipt signed by Dr. Popovic which was described by plaintiff as a "contract dated September 23, 1983 between Dr. Popovic (R. Gallo's laboratory) and L. Montagnier relative with the receipt by Dr. Popovic of the LAV's strain isolated by L. Montagnier and co-workers and described in Science May 20, 1983."

By a letter dated August 26, 1985, plaintiff sent a legal memorandum which set forth a conclusion that "the Gallo et al patent can be considered as not valid." The memorandum also asserted that "the Institut Pasteur can establish a prima facie case of breach of contract in that the retrovirus given to Dr. Popovic or one derived therefrom to the best of Institut Pasteur's knowledge, was used in contravention of the terms of the letter agreement." Plaintiff also suggested that collection of royalties by the United States constituted "unjust enrichment."

By a letter dated September 6, 1985, HHS responded to the material transmitted by plaintiff, as follows:

This letter refers to your discussions with me and staff of the Department on August 6 and 7 and the material you subsequently submitted to me in support of your position on the Institut Pasteur applications for a patent on a diagnostic test for Acquired Immune Deficiency Syndrome (AIDS) antibodies.

We have carefully reviewed the written material you furnished and the oral representations made during your visit to the Department. Based on that information and our own review of the laboratory records and other documents relating to this matter, we can find no basis to support your position that U.S. Patent No. 4,520,113 is invalid or that the actions you requested be taken by the Department are warranted.

Nevertheless, we are concerned that this issue not stand in the way of further

cooperation between this Department and the Institut Pasteur, as well as with research scientists throughout the world, towards the cure and prevention of this dreaded disease. We stand ready to discuss these and related matters with you and to review any other materials you may wish to submit relating to this issue.

Plaintiff's complaint was then filed in this matter on December 12, 1985. This complaint alleges that acts of the United States, in obtaining a diagnostic test kit patent, negotiating license agreements and obtaining royalties constitute "breach of the express contract wherein defendant agreed to use the LAV strain received exclusively for biological, immunological and nucleic acid study research purposes, and agreed not to use such specimen for any industrial purposes and not to disseminate the virus without the prior written consent of Pasteur." The complaint also alleges breach of an implied contract, as follows:

30. The acts of defendant as aforesaid have deprived Pasteur of the full commercial and industrial benefit of its first isolation of LAV, in that the scientists at the NCI have failed to provide Pasteur with the results obtained by them in the experiments performed on the two Pasteur samples, contrary to accepted custom, usage and practice in the scientific community.

31. The acts by defendant United States as aforesaid constitute breach of the implied contracts and obligations of confidentiality, noncommercialization, non-use for industrial purposes, sharing of information, and appropriate recognition and acknowledgment of discoveries and advances, which defendant's agents and employees undertook in accepting from Pasteur the various scientific materials and confidential research informa-

tion described above, all to the great damage to Pasteur.

As relief plaintiff seeks, in part, an accounting of royalties, and damages exceeding $1 million with correction of applicable records.

### Discussion

In its several submissions to date in this matter, defendant asserts that the NCI researchers' discovery of a cell line in which the AIDS virus could be continuously grown and the development of a blood test kit which used the virus harvested from the cell line did not depend on and was not derived from plaintiff's LAV. Clearly, there exists a major factual dispute as to whether, as plaintiff asserts, the LAV it provided was the "master key" in NCI's research or whether, as defendant asserts, the discovery of HTLV–III and the NCI test kit patent are the result of independent NCI research.

Before this factual controversy can be reached, it must be determined whether the Claims Court has jurisdiction over it. That is the issue now raised by defendant's several motions and plaintiff's oppositions.

Plaintiff grounds this action solely upon the Claims Court jurisdiction, provided in 28 U.S.C. § 1491(a)(1), to render judgment upon any claim against the United States founded upon any express or implied contract with the United States. Plaintiff pleads the September 23, 1983 receipt as such an express contract and an "understanding" with NCI researchers together with accepted custom, usage and practice in the scientific community as such an implied contract providing Claims Court jurisdiction.

◼ While questions concerning the contractual status of the September 23, 1983 document and the "understanding" as pleaded could be debated,[2] two issues in-

---

2. The scope of any September 23, 1983 agreement is not obvious from the text. *See Tree Farm Development Corp. v. United States,* 218 Ct.Cl. 308, 585 F.2d 493 (1978); *Fincke v. United States,* 230 Ct.Cl. 233, 675 F.2d 289 (1982). The implied contract claim, as pleaded by plaintiff, may well be premised upon an asserted contract implied in law. As opposed to a consensual agreement, the reference to accepted custom, usage and practice in the scientific community and the claim of "unjust enrichment" in the August 1985 meeting between plaintiff and HHS, discussed above, points to such a conclusion. An implied in law contract cannot form

volving jurisdiction have been briefed at the request of the court. These are whether the NCI personnel who dealt with plaintiff had the requisite authority to contract for the United States, and whether any contract which may have resulted is within the scope of the Contract Disputes Act, 41 U.S.C. § 602(a).

### Contractual Authority

Defendant moves for summary judgment on the basis that none of the NCI personnel plaintiff cites as involved with respect to the September 23, 1983 transaction or the implied contract "understanding" had requisite authority to contractually bind the United States so as to provide a jurisdictional predicate for this litigation.

The declaration of Dr. Peter J. Fischinger, deputy director, NCI, submitted by defendant, states that "Neither Dr. Gallo nor Dr. Mikulas Popovic of his laboratory have been delegated the authority to enter into any collaborative arrangement which would incur financial obligations on behalf of the United States." Dr. Fischinger also states that, "No individual scientist in a NCI laboratory, including Dr. Gallo and Dr. Popovic, has the authority to enter into any agreement to bind the United States with respect to patents and related rights including the disposition of royalties arising out of collaborative arrangements entered into by NCI or its scientists." Dr. Fischinger states that this authority has not been delegated below the Assistant Secretary for Health, HHS.

The declaration of Philip D. Amoruso, associate director for administrative management, NCI, submitted by defendant, states that neither Dr. Gallo nor any member of his staff, including Dr. Popovic, has been delegated any contracting officer authority or any other authority to bind the NCI to the expenditure of funds. Mr. Amoruso states that on September 23, 1983 Dr. Popovic was not a regular employee of

the United States, but was retained by the NCI under a fellowship authorized by 42 U.S.C. § 209(g), and has continued in this status.

Plaintiff argues that neither the September 23, 1983 transaction nor the "understanding" obligated the United States to expend funds concerning patent and related rights. Plaintiff urges that these declarations as to lack of authority have no relevance to the contracts pleaded herein which, according to plaintiff, comprise "non-procurement collaborative research agreements."

■ To bind the United States to an express or implied contract, one must deal with government personnel having actual authority. *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Operational Manuals, Inc. v. United States,* 205 Ct.Cl. 854, 856, 506 F.2d 1406 (1974); *Molony & Rubien Const. Co. v. United States,* 214 Ct.Cl. 809, 566 F.2d 1189 (1977). The authority required must be viewed in the context of the contractual reach claimed by plaintiff. *See Orchards v. United States,* 4 Cl.Ct. 601, 607 (1984), *aff'd, H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed. Cir.1984).

This litigation seeks, on the basis of a contract(s) with the United States, an accounting of royalties received by the government and damages exceeding $1 million. A binding contract so controlling patent and related rights and subjecting the United States to very substantial appropriated fund liability, 28 U.S.C. § 2517, 31 U.S.C. § 1304, 41 U.S.C. § 612, would appear, on the present record, to require approval by no less than the appropriate Assistant Secretary, HHS. Nowhere does plaintiff even suggest it had "contractual" dealings with personnel at a higher level than the research scientists at NCI.

In this circumstance, there is an obvious question whether a binding contract(s) to

the basis for Claims Court jurisdiction under 28 U.S.C. § 1491. *See Aetna Casualty & Surety Co. v. United States,* 228 Ct.Cl. 146, 655 F.2d 1047 (1981); *United States Steel Corp. v. United*

*States,* 210 Ct.Cl. 228, 536 F.2d 921 (1976); *Fincke v. United States,* 230 Ct.Cl. 233, 246, 675 F.2d 289, 296 (1982).

support jurisdiction in this matter under 28 U.S.C. § 1491(a) can exist. *See H.F. Allen Orchards v. United States, supra; EWG Associates, Ltd. v. United States,* 231 Ct.Cl. 1028 (1982); *Byrne Organization, Inc. v. United States,* 152 Ct.Cl. 578, 586, 287 F.2d 582 (1961).

■ Plaintiff argues that *Lebanon Chemical Corp. v. United States,* 5 Cl.Ct. 812 (1984), is directly on point in that, in that case, an EPA official, who was not a contracting officer, was held to have executed a binding agreement supporting relief in a Claims Court action. The court there ruled that the official had actual authority to enter into the settlement agreement involved, much as government attorneys have authority to bind the United States in litigation matters. Nevertheless, the same principle of required actual authority is present. Settlements which are beyond the authority of the government agent involved to execute are not binding upon the United States. *See United States v. Newport News Shipbuilding & Dry Dock Co.,* 571 F.2d 1283 (4th Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 439 U.S. 875 (1978); *Thomson v. United States,* 174 Ct.Cl. 780, 357 F.2d 683 (1966).

While plaintiff has framed its implied contract argument in terms of understandings and scientific community custom, usage and practice, it has submitted some evidence suggesting that NCI may have an established and authorized policy concerning agreements on the commercial use of cell line samples obtained from other sources. As noted in the discussion of facts, *supra,* NCI has utilized a receipt form with guidelines similar to plaintiff's September 23, 1983 document. Plaintiff submits an example, dated October 4, 1984, covering a cell line sample sent by Dr. Gallo's laboratory to a laboratory in Denmark. The guidelines set forth include one that work would be on a collaborative basis and one that the cell line "will not be used for commercial purposes. A U.S. Government (National Cancer Institute) patent is in effect."

Where agencies have published regulations prescribing how unsolicited proposals for contracts should be worded to incorporate a restrictive legend for trade secret material and prohibit agency personnel from disclosing, or using the secrets except for evaluation, it has been held that agency personnel receiving such proposals under the regulations possess the authority to agree not to disclose such secrets. Unauthorized disclosure of unsolicited proposals has been held to constitute a breach of an implied in fact contract supporting jurisdiction in this court under 28 U.S.C. § 1491. *Airborne Data, Inc. v. United States,* 702 F.2d 1350 (Fed.Cir.1983); *Research, Analysis & Development, Inc. v. United States,* 8 Cl.Ct. 54 (1985).

There exist differences between the situation involved in the unsolicited proposal cases and the matter at issue. In this case, counsel were requested to supply all relevant HHS/NCI regulations, if any, concerning contractual authority and none have been presented involving cell sample guidelines similar to those controlling disclosure of proprietary data as discussed in the above cited cases. The proprietary data/unsolicited proposal cases arise in the context of persons seeking government contracts, so that the submissions generally involve traditional agency procurement personnel. *See Radioptics, Inc. v. United States,* 223 Ct.Cl. 594, 612, 621 F.2d 1113, 1123 (1980). This has not been the situation involved in the instant case.

■ However, even absent a regulatory base, the fact that NCI, itself, places a no commercial use guideline in a cell line form, conceivably could reflect an established policy of sufficient formality and appropriate high level authorization to produce, by analogy to the unsolicited proposal cases, a binding agreement when research scientists receive and use the samples so covered. This matter has not been adequately addressed in the material filed to date. Absent this policy possibility, summary judgment on the issue of authority would be granted on defendant's motion. With this policy possibility, as barely sug-

gested by the October 4, 1984 form plaintiff submits, it is concluded that the authority question must remain open for subsequent resolution. This can be addressed and ventilated initially in any further proceeding plaintiff may choose to initiate as a result of the conclusion reached in the following discussion.

### Contract Disputes Act

It is assumed, solely for the purposes of this discussion, that plaintiff has established the existence of valid and binding contract(s) with the United States as it pleaded. The Contract Disputes Act (CDA), 41 U.S.C. § 602(a)(1), provides that it is applicable to any express or implied contract entered into by an executive agency for "(1) the procurement of property, other than real property in being; * * *." If a contract is within the coverage of the CDA, a prerequisite to Claims Court jurisdiction, for claims over $50,000, is the prior presentation of a certified claim to an agency contracting officer and a decision (or a failure to decide) by that officer. 41 U.S.C. § 605(a) and (c); *Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 645 F.2d 966 (1981); *Prefab Products, Inc. v. United States*, 9 Cl.Ct. 786 (1986).

■ A review of the material plaintiff has furnished as to its presentations to HHS shows that it has not submitted a certified claim to an HHS contracting officer and has, as a result, not obtained such a decision (or a failure to decide). The crucial issue for Claims Court jurisdiction then is whether the contract(s) plaintiff pleads is within the coverage of the CDA.

Because the scientific material which is the subject matter of the pleaded contract(s) is clearly "property," but not real property in being, the contract(s) is squarely within the CDA. *See Forman v. United States*, 767 F.2d 875 (Fed.Cir.1985); *compare Coastal Corp. v. United States*, 713 F.2d 728 (Fed.Cir.1983) (property not involved).

Plaintiff argues that "procurement" of the property is not involved in that defendant did not pay for the LAV. However, a cash "payment" is not the applicable test. According to plaintiff, by providing the LAV samples, it expected to obtain research results in return from NCI which, given the relief sought in this litigation, would appear to have substantial monetary value. Clearly, if a contract(s) is involved in this matter, it comes within the definition of "procurement" as set forth in 41 C.F.R. § 1.1–209 (1983), which includes the concept of barter. Plaintiff does not claim it was "donating" the LAV samples to NCI.

Because plaintiff has not complied with the mandatory requirements of the CDA, this court lacks jurisdiction over this litigation and the complaint must be dismissed. *Prefab Products, Inc. v. United States*, *supra* (and cases cited therein).

### Conclusion

It having been concluded that jurisdiction is lacking over plaintiff's complaint, it is ORDERED:

(1) Final judgment shall be entered dismissing plaintiff's complaint without prejudice, with no costs to be assessed;

(2) Except as so granted in (1), all pending motions are otherwise denied as moot.