James R. and Rebecca **BAKER,**
Plaintiffs,

v.

The **UNITED STATES,** Defendant.

No. 00–754C.

United States Court of Federal Claims.

Sept. 26, 2001.

Ray Fargason, Lubbock, TX, for plaintiffs.

Brent M. McBurney, Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. David M. Stauss, Department of Agriculture, of counsel.

## *OPINION*

MILLER, Judge.

This case is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment. The issues to be decided are (1) whether a contract between farmers and the United States exists by virtue of the farmers having submitted a qualified application for a loan note guarantee pursuant to the Consolidated Farm and Rural Development Act and its implementing regulations; and (2) if no such contract is found to exist, whether the Court of Federal Claims otherwise has jurisdiction to hear their claims for fraud, breach of fiduciary duty, and violation of due process. Argument is deemed unnecessary.

## FACTS

The following undisputed facts are drawn from the complaint and the filings beyond the complaint. The Consolidated Farm and Rural Development Act of 1961, as amended, 7 U.S.C. §§ 1921–2008f (1994) (the "CFRDA"), authorizes the Secretary of Agriculture to make and guarantee various kinds of loans, including farm loans, to farmers and rural residents. In 1972 Congress authorized the Secretary of Agriculture to guaran-

tee loans to eligible persons from federal and state chartered banks, savings and loan associations, and lending agencies. *Id.* § 1929(h). James R. Baker and Rebecca Baker ("plaintiffs") are farmers who reside in Knox City, Texas. In 1995 plaintiffs sought a $400,000.00 loan (the "loan") to purchase 100 pairs of cows and calves to increase their operating revenue. This case deals with plaintiffs' efforts to service their loan under the CFRDA through the United States Department of Agriculture's Farm Services Agency ("FmHA/FSA").[1]

Plaintiffs sought the loan directly from their lender, First National Bank of Haskell (the "Bank"), but the Bank determined that the loan could not be made without a 90% guarantee from FmHA/FSA. On August 1, 1995, plaintiffs signed an agreement with Capital Resources Spending Group ("CFRG"), a "loan processor" certified to prepare loan guarantee applications. CFRG completed a FmHA/FSA loan guarantee application package for plaintiffs, which was submitted to the Bank for review and approval in September 1995. The Bank reviewed the application, and on September 21, 1995, its vice president approved and signed the application on behalf of the Bank. The vice president also certified that the Bank was unable to make a direct loan to plaintiffs without the 90% guarantee. Plaintiffs signed the loan application on September 25, 1995.

On October 20, 1995, the FmHA/FSA Area Credit Manager in Vernon, Texas, issued a written decision denying the guaranteed loan request. The decision listed a number of reasons for the denial, including that the "[p]rojected income from crops did not appear realistic." FmHA/FSA noted that plaintiffs' records "indicate grazing out the wheat" and that no historical figures were available to support the projected revenue for harvesting wheat. *Id.* After a meeting between the Bank and agency officials, the Bank submitted additional information. On January 2, 1996, FmHA/FSA issued a letter stating that the decision to deny the loan guarantee had not changed.

1. The Farm Services Agency formerly was known as the Farmers Home Administration ("FmHA"); the parties refer to it by the acronym FmHA/FSA, and the court uses this acronym for the sake of continuity.

The Bank timely filed an appeal to the Department of Agriculture's National Appeals Division ("NAD"). The NAD hearing was held on April 2, 1996. In his May 3, 1996 decision, the NAD hearing officer noted that FmHA/FSA withdrew all issues except the "wheat harvesting" issue. He reversed the FmHA/FSA decision to deny the application due to "excluding the harvest of wheat for grain." FmHA/FSA was directed to "implement" this determination. Under 7 U.S.C. § 7000 (1994), and 7 C.F.R. § 11.12(a) (1996), FmHA/FSA personnel were responsible for implementing the hearing officer's decision within 30 days. That 30–day period expired on June 2, 1996.

On June 26, 1996, the FmHA/FSA District Director in Vernon, Texas, wrote to the Bank stating that FmHA/FSA would implement the hearing officer's decision. FmHA/FSA, however, requested "updated" financial information to reflect then-current market prices, rather than those in existence at the time the application was initially submitted. The letter also requested new appraisals of crops and livestock based on then-current values.

On July 19, 1996, the Bank's representative wrote to FmHA/FSA inquiring why the hearing officer's decision had not been implemented. On July 29, 1996, the Bank's president wrote to FmHA/FSA stating that the Bank should not be required to submit new application materials and requesting that FmHA/FSA implement the hearing officer's decision by issuing the loan guarantee. On August 20, 1996, FmHA/FSA reiterated that new information was still required. Over the next several months, the Bank requested that FmHA/FSA implement the hearing officer's decision and took the position that FmHA/FSA was in violation of applicable statutes and regulations. FmHA/FSA responded on December 3, 1996, insisting that the agency was authorized to demand new and updated application materials, asserting other grounds for denying the guarantee, and stating that the guarantee would not be issued without updated information.

The Bank rejected this interpretation and demanded implementation of the hearing officer's decision. By letter of January 16, 1997, FmHA/FSA denied the loan guarantee application. That denial precipitated a complaint filed by the Bank in federal district court seeking implementation of the hearing officer's determination. On April 3, 1998, the district court granted the Bank's motion for summary judgment, holding that FmHA/FSA's actions were arbitrary, capricious, and not in accordance with the law and ordering FmHA/FSA "to take the next step in loan processing which would have occurred had no adverse decision been made and appeal filed, based upon the facts and law as they existed at the time of the original application." *First National Bank v. Glickman,* No. 5–97–CV–133–C, slip op. at 21–23 (N.D.Tex. Apr. 3, 1998).

Thereafter, FmHA/FSA took the steps necessary to close the guaranteed loan transaction. A conditional commitment initially was issued on May 1, 1998. The Bank rejected the terms of the conditional commitment and proposed alternative terms, which were rejected by FmHA/FSA. An agreement eventually was reached, and on October 16, 1998, a Loan Note Guarantee was issued by FmHA/FSA, a Loan Agreement between First National Bank and plaintiffs was executed, and First National Bank extended a Loan Note to plaintiffs.

Plaintiffs filed this suit on December 13, 2000, alleging four bases for relief: (1) that FmHA/FSA's "refusal and failure to implement the NAD Hearing Officer's May 3rd, 1996, final appeal determination ... was a breach of the contract of FmHA/FSA with Plaintiffs either express or implied," Compl. filed Dec. 13, 2000, ¶¶ 20–21; (2) that this conduct "constitute[s] fraud on Plaintiffs," *id.* ¶¶ 14–18, 25; (3) that these "arbitrary and capricious acts constitute breach of fiduciary duty on Plaintiffs," *id.* ¶ 29; and (4) that FmHA/FSA's "failure and refusal to implement the NAD Hearing Officer's appeal determination constituted a deprivation of a protected property interest without the due process of law guaranteed by the Fifth Amendment," *id.* ¶ 31.

Defendant moves to dismiss each claim for lack of subject matter jurisdiction. Should jurisdiction be found proper, defendant moves in the alternative for summary judgment. Defendant cites the second, third, and

fourth claims as beyond the jurisdiction of the court, and argues that no contract exists between the parties to support plaintiffs' first claim.

## DISCUSSION

### I. *Breach of contract*

#### 1. *Subject matter jurisdiction*

■ The burden of proving that the Court of Federal Claims has subject matter jurisdiction over a claim rests with the party seeking to invoke its jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). At the pleading stage, general factual allegations may suffice to meet this burden, for on a motion to dismiss the court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). However, because proper jurisdiction is not merely a pleading requirement, "but rather an indispensable part of the plaintiff's case, each element [of subject matter jurisdiction] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citing *Nat'l Wildlife Fed'n,* 497 U.S. at 883–89, 110 S.Ct. 3177; *Gladstone, Realtors v. Vill. of Bellwood,* 441 U.S. 91, 114–15 & n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 526–27 & n. 6, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (Brennan, J., dissenting)). Therefore, as the parties invoking federal jurisdiction in this action, plaintiffs bear the burden of pleading the facts upon which the court's jurisdiction depends. *See McNutt,* 298 U.S. at 189, 56 S.Ct. 780.

Under the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994 & Supp. V 1999), the Court of Federal Claims is authorized to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

This jurisdiction extends only to claims for money damages and must be strictly construed. *United States v. Testan,* 424 U.S. 392, 397–98, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Moreover, while conferring jurisdiction, the Tucker Act does not create a substantive right enforceable against the United States for monetary damages. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Testan,* 424 U.S. at 398, 96 S.Ct. 948. "Instead, to invoke jurisdiction under the Tucker Act, a plaintiff must identify a contractual relationship, constitutional provision, statute, or regulation that provides a substantive right to money damages." *Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000).

Plaintiffs do not argue that any provision of the Consolidated Farm and Rural Development Act or its implementing regulations "mandate[ ] compensation by the Federal Government for the damage sustained." *Testan,* 424 U.S. at 400, 96 S.Ct. 948. Instead, they characterize their claim as sounding in contract:

> Plaintiffs had a contractual relationship with Defendant FmHA/FSA individually and through the Bank. The Plaintiffs were contractually bound to repay their loans as provided for in the loan documents and FmHA/FSA was contractually bound to follow its own laws, rules, and regulations, and to provide funding and guaranteed loans in accordance with its rules, regulations, and statutes.

Compl. ¶ 14. More to the point, plaintiffs' complaint alleges that FmHA/FSA's "refusal and failure to implement the NAD Hearing Officer's May 3rd, 1996, final appeal determination ... was a breach of the contract of FmHA/FSA with Plaintiffs either express or implied." *Id.* ¶¶ 20–21. The complaint makes no mention of when and how any contract between FmHA/FSA and plaintiffs was formed. Although defendant argues that jurisdiction is lacking because no contract

existed between plaintiffs and the United States, "the law is clear that, for the Court of Federal Claims to have jurisdiction, a valid contract must only be pleaded, not ultimately proven." *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997); *accord Spruill v. MSPB,* 978 F.2d 679, 686–87 (Fed.Cir.1992). Presuming that general allegations embrace those specific facts that are necessary to support the claim, plaintiffs have pleaded the elements of a contract with the Government. Accordingly, jurisdiction is present under the Tucker Act to adjudicate the merits of plaintiffs' breach of contract claims.

### 2. *Summary judgment*

Defendant also moves for summary judgment as to plaintiffs' breach of contract claim on two grounds. First, defendant argues that no contract between plaintiffs and FmHA/FSA ever existed. Defendant argues that plaintiffs were never in privity of contract with FmHA/FSA, nor were they third-party beneficiaries to any contract between FmHA/FSA and the Bank. Any contract that did exist between the parties was not formed until October 16, 1998, when the parties executed a Loan Agreement. Thus, in defendant's view, the conduct on which plaintiffs base their breach claim occurred prior to the formation of an actual contract.[2]

Summary judgment is appropriate only when the moving party is entitled to judgment as a matter of law and there are no disputes over material facts that may significantly affect the outcome of the suit. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. The moving party bears the burden of demonstrating the absence of genuine disputes over material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In its analysis the court may neither make credibility determinations nor weigh evidence and seek to determine the truth of the matter. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.; accord H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments"). Although summary judgment is designed " 'to secure the just, speedy and inexpensive determination of every action,' " *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1), a trial court may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### 3. *Breach based on an express or implied contract or contract created by a statute or regulation*

In their response to defendant's motion to dismiss, plaintiffs state generally: "The claims of a contractual nature are properly stated such that the Court may grant the relief requested by the Plaintiffs ...." Pls.' Br. filed July 9, 2001, at 5.

In this case Plaintiffs ... relied on the United States Government's offer to provide guaranteed loans through authorized banks. They accepted the Government's offer for loan guarantees to qualified applicants. Plaintiffs were qualified applicants who completely and properly submitted their loan package through the Bank. FSA issued a loan commitment to Plaintiffs and then breached that commitment through its arbitrary, capricious and unlawful actions.

*Id.* at 6. Although the complaint is silent as to when this contract came into existence, or to spell out its terms, the complaint can be read to allege that plaintiff entered into a contract that obligated FmHA/FSA to guarantee plaintiffs' loan, or that, regardless of whether a contract was formed to provide

---

**2.** Because the court determines that no contract could have been entered into by the Government prior to the alleged breaching conduct, the court does not address plaintiffs' status with regards to any contract subsequently formed.

the loan guarantee, the statute and regulations amount to an offer to consider the application in accordance with the schedule and guidelines set forth in the regulations. "Plaintiff's [sic] submitted a complete and qualified loan application relying upon the Government to act in accordance with it [sic] own regulations . . . ." *Id.* at 7.

### 1) Contract for loan guarantee

Plaintiffs can be understood to argue that the CFRDA amounts to an "offer" by the Government "to provide guaranteed loans through authorized banks," *id.* at 6, which was accepted by plaintiffs when they submitted an application for a loan guarantee to the Bank (which, in turn, was submitted by the Bank to FmHA/FSA).[3]

> By submitting the loan application package with a feasible farm (business) plan, my wife and I were accepting the offer made by the United States Government to enter into a loan agreement. The offer of the United States Government was contained in the statutes and regulations relating to FmHA loan guarantees that were in existence on September 25, 1995, when we signed the loan application package.

Affidavit of Plaintiff Jim Baker, July 5, 2001, ¶ 8; *see also* Affidavit of Plaintiff Rebecca Baker, July 5, 2001, ¶ 8 (identical). Because FmHA/FSA was required by statute and regulation to approve the application, plaintiffs argue that a contract was formed when the application was properly submitted: "[U]pon submission of the qualified application, there was a coming together of minds to recognize approval of the qualified application and promptly issue a loan note guarantee." Pls.' Br. filed July 9, 2001, at 7.

**3.** Given that the Bank submitted the application, plaintiffs argue in the alternative that submission of the application created a contract between the Bank and the Government to which plaintiffs are third-party beneficiaries. Because the court finds that no contract could have been entered into by the Government prior to the conduct alleged as breach, the court does not address plaintiffs' status in respect of any contract subsequently formed.

**4.** In *Testan* the Court concluded that the Tucker Act did not confer jurisdiction over a complaint filed by Civil Service employees who claimed

■ "The general requirements for a binding contract with the United States are identical for both express and implied contracts." *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir.1997). To establish a contract with the Government, plaintiff must show (1) mutuality of intent to contract; (2) consideration; (3) lack of ambiguity in offer and acceptance; and (4) actual authority of the Government representative whose conduct is relied upon to bind the Government in contract. *Lewis v. United States,* 70 F.3d 597, 600 (Fed.Cir.1995).

■ Generally, however, "[t]he United States cannot be contractually bound merely by invoking the cited statute and regulation." *Merrick v. United States,* 846 F.2d 725, 726 (Fed.Cir.1988). To hold otherwise would blur the distinction between a claim founded on a money-mandating statute or regulation and one founded on a contract with the United States. The rule in *Testan*—that jurisdiction under the Tucker Act cannot be premised on the asserted violation of regulations that specifically do not authorize awards of money damages—cannot be avoided simply by characterizing the applicable statute or regulation as creating an implied contract.[4] The Supreme Court made this point in *Army & Air Force Exchange Service v. Sheehan,* 456 U.S. 728, 739–40, 102 S.Ct. 2118, 72 L.Ed.2d 520 (1982):

> Respondent cannot escape the force of *Testan* by relying on the Court's observation that the plaintiffs in that case did not "rest their claims upon a contract," and distinguishing this case on the ground that the regulations effected an implied contract. To accept this reasoning would be to undermine the Court's ruling in *Testan* that the Tucker Act provides a remedy

that they were entitled to reclassification at a higher grade. 424 U.S. at 398–400, 96 S.Ct. 948. The Court reasoned that a plaintiff's "asserted entitlement to money damages depends upon whether any federal statute can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* at 400, 96 S.Ct. 948. The Court explicitly rejected the argument that "the violation of any statute or regulation relating to federal employment automatically creates a cause of action against the United States for money damages." *Id.* at 401, 96 S.Ct. 948.

only where damages claims against the United States have been authorized explicitly.

The Court in *Army & Air Force Exchange Service* did note an exception to this reasoning: a line of cases "where contracts were inferred from regulations promising payment." *Id.* at 739 n. 11, 102 S.Ct. 2118 (citing *Griffin v. United States*, 215 Ct.Cl. 710, 714–15 (1978); *N.Y. Airways, Inc. v. United States*, 177 Ct.Cl. 800, 816–17, 369 F.2d 743, 751–52 (1966); *Radium Mines, Inc. v. United States*, 139 Ct.Cl. 144, 147–48, 153 F.Supp. 403, 405–06 (1957); *Aycock–Lindsey Corp. v. United States*, 171 F.2d 518, 521 (5th Cir.1948); and *Augusta Aviation, Inc. v. United States*, 500 F.Supp. 785, 786–87 (S.D.Ga.1980), *rev'd*, 671 F.2d 445 (11th Cir.1982)).

■ In *New York Airways*, for example, three helicopter companies claimed sums owed to them by the Government for carrying the mail. The plaintiffs were authorized to carry mail under a certificate issued by the Civil Aeronautics Board (the "CAB") pursuant to the Federal Aviation Act of 1958. Under its statutory authority, the CAB also promulgated an order fixing the monthly compensation to be paid to the plaintiffs for transporting mail. Defendant argued that neither the statute nor the certificate created a contractual obligation on the part of the Government to compensate the plaintiffs. The Court of Claims, however, held that "[t]he Board's rate order was, in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and the actual transportation of the mail was the plaintiffs' acceptance of that offer." *Id.* at 816, 369 F.2d at 751.

*Radium Mines* dealt with regulations issued by the Atomic Energy Commission pursuant to the Atomic Energy Act of 1946 establishing "guaranteed minimum prices ... for the delivery to the Commission ... of domestic refined uranium, high-grade uranium bearing ores and mechanical concentrates, in not less than the quantity and grade specified in paragraph (e) of this section." 139 Ct.Cl. at 146, 153 F.Supp. at 404. The regulations provided that, "[u]pon receipt of an offer and sample [meeting] the conditions of this section, the Commission will forward to the person making the offer a form of contract containing applicable terms and conditions ready for his acceptance." *Id.* at 147, 153 F.Supp. at 405. The plaintiff argued that the regulations were an offer, "which ripened into a contract when it was accepted by the plaintiff's putting itself in a position to supply the ore or the refined uranium." *Id.* The Court of Claims agreed:

[The regulation's] purpose was to induce persons to find and mine uranium.... It could surely not be urged that one who had complied in every respect with the terms of the [regulation] could have been told by the Government that it would pay only half the "Guaranteed Minimum Price," nor could he be told that the Government would not purchase his uranium at all.

*Id.* at 147–48, 153 F.Supp. at 406.

The key to each of these cases, as indicated by *Army & Air Force Exchange*, is that the regulations at issue were promissory in nature. 456 U.S. at 739 n. 11, 102 S.Ct. 2118 (referring to cases "where contracts were inferred from regulations promising payment"); *see also Nat'l By–Products, Inc. v. United States*, 186 Ct.Cl. 546, 558–59, 405 F.2d 1256, 1263 (1969) ("Before a representation can be contractually binding, it must be in the form of a promise or undertaking ... and not a mere statement of intention, opinion, or prediction."); Restatement (Second) of Contracts § 18 (1981) ("Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance."). By insisting on an identifiable, legally operative promise by the Government, the court maintains fidelity to the rule that "the Tucker Act provides a remedy only where damages claims against the United States have been authorized explicitly." *Army & Air Force Exch. Serv.*, 456 U.S. at 739–40, 102 S.Ct. 2118.

In contrast to these cases is *Cutler–Hammer, Inc. v. United States*, 194 Ct.Cl. 788, 794, 441 F.2d 1179, 1182–83 (1971), where the Court of Claims stated: "In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or

statement of opinion or intention." In that case seven industrial users of silver had filed applications to purchase silver from the Treasury Department pursuant to regulations setting the maximum sales price and the conditions on which silver would be sold. Shortly after the applications were filed, Treasury stopped selling silver at the fixed price established in the regulation and, instead, began selling silver under a competitive bid procedure. The plaintiffs argued that the regulations were an offer that was accepted upon the filing of their applications, or that their applications constituted offers that were accepted upon acknowledgment by the Treasury Department. The Court of Claims rejected both formulations:

> In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention. We find nothing in the language of the Regulation or the acknowledgement [sic] which could be construed as contractual in nature, by that standard. That is, nowhere is there a *promise* on the part of the Government to sell even one ounce of silver at the price mentioned. Purchasers are simply invited to make "application" to buy certain quantities of silver at a price which will be *not less than* $ 1.29 + .... These applications were in turn subject to the approval of the Director of Domestic Gold and Silver Operations .... Providing that the application be subject to such approval is alone sufficient to negate existence of a contract until the approval is granted.... Even if the language could otherwise be given such a meaning, the requisite approval was a condition precedent to the formation of any binding contracts.... It requires a distortion of plain English to infer that making an application in conformity with the terms of this Regulation would constitute an acceptance of an offer whereby the United States intended to bind itself.

*Id.* at 794–95, 441 F.2d at 1182–83. *Cutler–Hammer* expressly distinguished itself from *New York Airways* and *Radium Mines:*

[In *Radium Mines,* we] rejected the contention of the Government there that the Regulation was not an offer "but a mere invitation to the industry ...., which the Government could then accept or reject as it saw fit." We found that the purpose was to induce persons to find and mine uranium and that such *actual performance in reliance thereon* was sufficient to complete the contract. There was similar reasoning in *New York Airways v. United States,* where we held: "The actions of the parties support the existence of a contract at least implied in fact. The Board's rate order was, in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and *the actual transportation of the mail was the plaintiffs' acceptance of that offer.*"

*Id.* at 796, 441 F.2d at 1183. By contrast, the plaintiffs in *Cutler–Hammer* were not invited to accept by performance: "The only effort to be expended by these plaintiffs was to fill in the blanks of a Government prepared form." *Id.; see also Tree Farm Dev. Corp. v. United States,* 218 Ct.Cl. 308, 320, 585 F.2d 493, 500 (1978) ("We quote from *Cutler–Hammer* to show that invitations by the Government to file applications do not necessarily equal an operative offer, the acceptance of which will result in a binding contract."); *Girling Health Sys., Inc. v. United States,* 22 Cl.Ct. 66, 71–72 (1990) ("[M]ere solicitations, invitations or instructions from the Government are not offers to contract that bind the Government upon plaintiff's completion of a form, even when the solicitations, invitations or instructions are embodied in a statute or regulation."), *aff'd,* 949 F.2d 1145 (Fed.Cir.1991); *Last Chance Mining Co. v. United States,* 12 Cl. Ct. 551, 555–56 (1987) (finding statutes and regulations governing procedures for filing mining claims not offers and stating: "It would do violence to traditional contract theory, not to mention the operation of government, to hold that any statute requiring some action by a citizen to obtain a benefit or protect a right constituted an open offer to contract"), *aff'd,* 846 F.2d 77 (Fed.Cir.1988) (unpublished table decision).[5]

5. Because plaintiffs are the intended beneficia-   ries of the Consolidated Farm and Rural Devel-

Similar reasoning has led the Federal Circuit to decline to construe federal moiety statutes as offers to contract. In *Lewis v. United States*, 70 F.3d 597 (Fed.Cir.1995), plaintiff contacted the United States Customs Service and offered to provide information concerning the illegal purchase and importation of arms from Vietnam. Plaintiff claimed that the Customs Service's "informer award" statute, 19 U.S.C. § 1619, constituted an offer, under which the United States promised to pay an award to anyone who provided original information regarding violations of the customs laws. No award was ever paid, because the investigation was terminated without any arrests being made or enforcement proceedings being initiated.

Plaintiff then filed a complaint in the Court of Federal Claims, alleging that by his agreement to provide information he had entered into an implied-in-fact contract with the Government and that, by obstructing and otherwise failing to pursue the investigation, Customs officials had interfered with his performance under that contract. Recognizing that an implied-in-fact contract requires "lack of ambiguity in offer and acceptance," the Federal Circuit in *Lewis* held that section 1619 was too ambiguous in its terms, and conferred too much discretion on the Secretary of the Treasury in deciding whether to award payments to informants, to serve as the basis for a contract. 70 F.3d at 600–01.[6]

opment Act, *Cutler–Hammer* putatively supports their contract claim. *See* 194 Ct.Cl. at 796, 441 F.2d at 1183 (noting that "[t]he plaintiff in *Radium Mines* ... was an intended beneficiary of the policy, proclaimed in that Regulation, 'to stimulate domestic production of uranium,'" whereas the plaintiffs in *Cutler–Hammer* "were simply the incidental beneficiaries of a Government policy, the purpose of which was to protect the coinage, not to provide windfall profits to silver buyers"). *Cutler–Hammer's* primary rationale, however, is that, absent promissory language in a regulation, no contract will be found simply because an applicant requests that the Government act according to the regulation. This was the reading given to *Cutler–Hammer* by *Tree Farm*, which, like the instant case, dealt with a loan guarantee program intended to benefit the plaintiffs.

**6.** Another line of cases, however, construed section 1619 to be money-mandating, thereby suggesting an analytical distinction between a claim founded directly on a statute or regulation and a claim founded upon a contract implied from a statute or regulation. *Doe v. United States*, 100 F.3d 1576, 1582 (Fed.Cir.1996), held:

[S]ection 1619 continues to require the payment of some award to claimants who have met the statutory conditions for recovery .... Contrary to the Government's contention, this satisfies the requirement under [*Eastport S.S. Corp. v. United States*, 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967)] that "the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum."

The Federal Circuit distinguished *Lewis*, indicating that more would be required to construe a statute to be an offer to enter into a contract than to construe the statute as money-mandating:

Recognizing that an implied-in-fact contract requires lack of ambiguity in offer and acceptance, [*Lewis*] found that without a corresponding offer from the Government to pay a specific award, the award provided for in section 1619 was too ambiguous in amount to support by itself a contract claim.

*Lewis* did not consider the question presently before us, namely whether amended section 1619, construed in light of precedent and in accordance with Congressional intent, mandates under the prescribed circumstances the payment of money, and thus supports a Tucker Act claim.

*Id.* at 1582 n. 5 (citations omitted). *Doe* instructs that "[t]he fact that the Secretary retains some discretion to determine the amount of an award, within prescribed limits," while preventing the statute from being construed as an offer, "does not preclude the statute from being money-mandating." *Id.* at 1582.

Similarly, in *Grav v. United States*, 14 Cl.Ct. 390 (1988), *aff'd*, 886 F.2d 1305 (Fed.Cir.1989), the Federal Circuit and Claims Court suggested that while a statute containing an offer to enter into a contract may be a statute mandating payment, not all money-mandating statutes are offers to enter into a contract. Plaintiffs in *Grav* applied for participation in the Government's Milk Diversion Program (the "MDP"), but were deemed ineligible for the program after they had transferred dairy cattle to a third person contrary to the statute. The trial court concluded that the language of the statute setting up the MDP offered milk producers a unilateral contract, provided that they met certain criteria, which they could accept by performance, or that the MDP statute created an implied contract, provided that plaintiffs met the criteria, with intent for the Government being manifested by the language of the statute and intent for the milk producers being manifested by their application for the program. 14 Cl.Ct. at 393. *But see Morgan v. United States*, 12 Cl.Ct. 247 (1987) (declining to construe the MDP as an offer based upon implementing regulations); *Halbert v. United States*, 17 Cl.Ct. 596 (1989) (same). According to the trial court: "If the statute is construed as an offer, then the statute is clearly an Act of

In *Merrick v. United States,* 846 F.2d 725, 726 (Fed.Cir.1988), the Federal Circuit confronted an informant's claim under 26 U.S.C. § 7623, authorizing the Secretary of the Treasury "to pay such sums ... as he may deem necessary for detecting and bringing to trial and punishment persons guilty of violating the internal revenue laws." Relying on the discretion given to the IRS to decide whether to make an award, *Merrick* stated broadly: "The United States cannot be contractually bound merely by invoking the cited statute and regulation." 846 F.2d at 726; *see also Saracena v. United States,* 206 Ct.Cl. 90, 95–96, 508 F.2d 1333, 1336 (1975). In *Merrick* the Federal Circuit held that the subject statute and regulation amounted to "an indefinite reward offer that an informant may respond to by his conduct." 846 F.2d at 726. *Merrick,* however, did not hold that the statute, by itself, contractually bound the Government: "An enforceable contract will arise under these authorities only after the informant and the government negotiate and fix a specific amount as the reward." *Id.; see also Lagermeier v. United States,* 214 Ct.Cl. 758, 760 (1977) ("There has been no offer by the Commissioner to pay any definite sum and, therefore, there has arisen no contract between the Commissioner and the plaintiff." (quoting *Gordon v. United States,* 92 Ct.Cl. 499, 500, 36 F.Supp. 639, 640 (1941))). Instead, the statute prevented the Government from arguing that, because plaintiff supplied information before the Government fixed the amount of the award, his conduct was merely past consideration that could not support an enforceable agreement.

Congress mandating payment to plaintiff such as is necessary for jurisdiction to be lodged in this court." *Grav,* 14 Cl.Ct. at 392.

The Federal Circuit, however, preferred to characterize the claim as one founded on a statute mandating the payment of money, rather than on a statute creating an express or implied contract:

Our analysis whether the Claims Court had jurisdiction turns on whether the Secretary of Agriculture was granted discretion to refuse participation by any applicant who was qualified for the program. We conclude the Secretary was not. Therefore, this is a money mandating statute that triggers Tucker Act jurisdiction in the Claims Court.

*Grav,* 886 F.2d at 1307. The panel noted that language allowing the Secretary of Agriculture to

These cases can be synthesized into the proposition that where a plaintiff claims a contractual obligation on the part of the Government stemming solely from a statute or regulation, the requirements of mutuality of intent to contract and lack of ambiguity require that the statute or regulation make an explicit promise—sufficient to justify another person in understanding that his assent to that bargain will conclude it and sufficient for the courts to determine the existence of a breach and give an appropriate remedy. *See, e.g., Modern Sys. Tech. Corp. v. United States,* 979 F.2d 200, 202 (Fed.Cir.1992) ("In the absence of contractual intent or sufficiently definite terms, no contractual obligations arise.").

### 2) *Statute and regulations as offer*

▮ The statute and regulations that comprise the Farmer's Loan Program in this case fairly cannot be characterized as an offer to make loan guarantees to qualified applicants under the standard identified in *Cutler–Hammer.* The applicable provisions merely create a process for receiving and considering applications and identify a series of intermediate communications and events that must occur prior to an agreement.

As noted above, the CFRDA authorizes the Secretary of Agriculture to guarantee loans to eligible persons from federal and state chartered banks, savings and loan associations, and lending agencies. 7 U.S.C. § 1929(h). The Secretary of Agriculture delegated this statutory authority to FmHA/FSA, 7 C.F.R. § 2.70(a)(1) (1995), which, in

set the terms and conditions of MDP contracts did not alter its money-mandating nature: "The import of this language is only to allow the Secretary to alter the quantities in a contract, but not to permit him to refuse to enter into a contract altogether with a qualified applicant." *Id.* at 1308.

*Grav* and *Lewis* indicate that the preferred analytical mode of the Federal Circuit is whether a statute or regulation is money-mandating, rather that whether they constitute an offer to contract. Plaintiffs, however, do not argue that any provision of the Consolidated Farm and Rural Development Act or its implementing regulations "mandate[] compensation by the Federal Government for the damage sustained." *Testan,* 424 U.S. at 400, 96 S.Ct. 948. Instead, they characterize their claim as based on a contract.

turn, promulgated regulations implementing Congress's loan program, *id.* pt.1980.

Pursuant to those regulations, a lender files an application package consisting of a variety of forms and attachments. *Id.* § 1980.113(a). Upon receipt of an application by FmHA/FSA, "the proper independent investigations, inspections, and appraisal reviews will be made to determine whether the loan applicant is eligible, whether the proposed loan/line of credit is for authorized purposes, whether there is reasonable assurance of positive cash flow projection, and whether there is sufficient collateral and equity." *Id.* § 1980.114. A County Committee then reviews the loan application to certify whether eligibility requirements are met. *Id.* § 1980.115, 1980.115(c).[7] Once the County Committee certification is obtained, the County Supervisor "will" prepare a request for obligation of funds and a conditional commitment. *Id.* § 1980.115 Administrative (A).[8] The conditional commitment is defined as FmHA/FSA's "advice to the lender that the material it has submitted is approved subject to the completion of all conditions and requirements set forth [in the conditional commitment]." *Id.* § 1980.6(a). "Any special conditions of approval will be listed in the space provided on the form, including requirements for security, improved management practices, and the type and frequency of financial reports required by [FmHA/FSA] but not required by the lender." *Id.* § 1980.115 Administrative (A)(2). Once loan funds are obligated, the conditional commitment is sent to the lender. *Id.* § 1980.115 Administrative (B)(3). The terms of the conditional commitment are then accepted or rejected by the lender, and additional or alternative terms are proposed.

The lender, after reviewing approval conditions and security requirements as set forth in [the conditional commitment], will complete and execute the "Acceptance or Rejection of Conditions" [which is attached to the conditional commitment] and return a copy to the County Supervisor. If the conditions cannot be met, the lender and loan applicant may propose alternatives to the County Supervisor. These alternatives will be considered and the lender will be advised of [FmHA/FSA's] decision to accept or reject the alternatives. If accepted, [the conditional commitment] will be so revised. If rejected, the County Supervisor will notify the loan application [sic] and the lender in writing within 10 calendar days for [FmHA/FSA's] decision of all the specific reasons for the decision, and advise them of their opportunity for appeal . . . .

*Id.* § 1980.116.

The court's inquiry is whether the statute, a regulation, or any action of FmHA/FSA expresses an intent to bind the Government, or manifests the material terms necessary to establish an enforceable contract. The statute cannot represent an offer on the part of the Government, for it is clearly permissive: "The Secretary may provide financial assistance to borrowers for purposes provided in this chapter by guaranteeing loans made by any Federal or State chartered bank, savings and loan association, cooperative lending agency, or other legally organized lending agency." 7 U.S.C. § 1929(h)(1). *Compare Grav v. U.S.*, 886 F.2d 1305 at 1307 (Fed.Cir. 1989) ("The language in the first part of the Dairy Production Stabilization Act of 1983 is clear: 'The Secretary *shall* . . . provide for a milk diversion program under which the Secretary *shall* offer to enter into a contract . . . with any producer of milk in the United States . . . .' "), *with id.* at 1308 ("The import of this language is only to allow the Secretary to alter the quantities in a contract, but not to permit him to refuse to enter into a

---

7. FmHA/FSA follows a two-tiered approval process. The application is initially reviewed by a County Supervisor. If the County Supervisor determines that the application may be acceptable, the application is presented to the County Committee for certification or rejection. If the County Supervisor determines that the application could not be accepted by the County Committee he may reject it outright. 7 C.F.R. § 1980.114(b)-(d).

8. The designation "Administrative" signals that these provisions are "for the benefit of State Directors, District Directors, and County Supervisors," and "set out the internal duties and responsibilities of [FmHA/FSA] personnel and outline the procedures to be followed in carrying out the requirements of the program." 7 C.F.R. § 1980.101(c).

contract altogether with a qualified applicant."). The CFRDA contains no promise to lenders, borrowers, or anyone, for that matter. Similarly, no manifestation of the Government's intent to enter into a contractual relationship can be inferred. While the statute clearly contemplates future contracts, it explicitly leaves the decision to enter into such contracts to the Secretary.

The FmHA/FSA's implementing regulations do not contain the language necessary to give rise to a unilateral contract. While cast in more mandatory terms—"It is the policy of [FmHA/FSA] to guarantee loans made to qualified applicants ... providing the applicant can execute a legal contract," 7 C.F.R. § 1980.101(a)—the regulations nevertheless lack definiteness and a manifestation of the Government's intent to enter into a contract upon receipt of an application. Plaintiffs' argument that "the Government repeatedly breached an implied contract to issue the loan guarantee upon receipt of a qualified application," Pls.' Br. filed July 9, 2001, at 7, betrays the infirmity in their claim—it ignores the intermediate steps in the application process that negate any inference of an offer on the part of the Government.

As an initial matter, the fact that the Secretary of Agriculture has decided to exercise his statutory authority only upon application by private parties militates against construing the regulations as an offer. Plaintiffs were not invited to accept by performance, distinguishing this case from *Radium Mines* and *New York Airways,* where the regulations were construed to invite performance as acceptance (in *Radium Mines,* the actual finding and mining of uranium; in *New York Airways,* the actual transportation of the mail). This conclusion follows from the principle that "[s]o long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is as yet no operative offer." *Cutler–Hammer,* 194 Ct.Cl. at 794, 441 F.2d at 1182 (quoting 1 Corbin on Contracts § 11 (1963)); *see also Grav,* 886 F.2d at 1310 (Mayer, J., dissenting) (quoting *Cutler–Hammer* ).

The language of the regulations does not suggest that applications for a loan guarantee are anything more than that—applications. Neither the regulations nor a qualified application contain the material terms of the ultimate guarantee agreement. Indeed, the amount of the guarantee is not determined until the conditional commitment is issued. Under 7 C.F.R. § 1980.20: "Lenders and applicants will propose the percentage of guarantee. Lenders and applicants will be advised in writing on [the conditional commitment] of any percentage of guarantee less than proposed by the lender and applicant, and the reasons therefore." Thus, until issuance of the conditional commitment, the most important term of the contract has not been agreed upon. Prior to issuance of the conditional commitment, the County Supervisor also identifies "special conditions of approval ... including requirements for security, improved management practices, and the type and frequency of financial reports required by [FmHA/FSA] but not required by the lender." *Id.* § 1980.115 Administrative (A)(2). The fact that the loan application and regulations contemplate future negotiation of material terms, and their reduction to a future writing—the conditional commitment, and ultimately the loan agreement and loan note guarantee—undercuts the notion that a meeting of the minds occurred upon submission of plaintiffs' application. *See* Restatement (Second) of Contracts § 27 cmt. b (1981) ("[I]f either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.").

The record is devoid of any communications between plaintiffs and FmHA/FSA, prior to the conditional commitment, that give rise to a contract. Plaintiff argues that "FSA issued a loan commitment to Plaintiffs and then breached that commitment through its arbitrary, capricious and unlawful actions." Pls.' Br. filed July 9, 2001, at 6.

24. On June 26, 1996, the Agency wrote to the Bank stating that the Agency would

implement the Hearing Officer's decision. However, in that same letter the Agency *refused* to implement the Hearing Officer's decision in three ways . . . .

25. At that point, we had a contract with the Agency (FSA) because the Agency had issued commitment for the loan guarantee as applied for, and now the Agency (FSA) was not complying with its commitment.

J. Baker Aff., ¶¶ 24–25; *see also* R. Baker Aff., ¶¶ 24–25 (identical). Exactly what "loan commitment" plaintiffs are referring to is unstated. The only communications from FmHA/FSA prior to June 26, 1996, that have been discussed by the parties are the October 20, 1995 initial denial; the January 2, 1996 letter reviewing the initial denial; the May 3, 1996 NAD Appeal Determination; the June 6, 1996 memorandum from the national office to the State Director informing the state office that the appeal would not be reviewed; the June 7, 1996 Notice of Conclusion of Appeal; and the June 17, 1996 memorandum from the State Office to the District Office, stating that the appeal would not be reviewed. None of these communications fairly can be considered a promise to enter into a contract.

The October 20, 1995 initial denial and the January 2, 1996 letter reviewing the initial denial are not "loan commitments"; they are refusals to make a loan. The May 3, 1996 NAD Appeal Determination is not a "loan commitment." It is an order correcting an error of law on the part of FmHA/FSA, and requiring that FmHA/FSA implement that decision.

Plaintiffs make much of the NAD Appeal Determination. According to plaintiffs, after the appeal determination, "the only option for FmHA/FSA was to issue the loan guarantee in response to Plaintiffs' complete and qualified application based upon their contractual agreement." Pls.' Br. filed July 9, 2001, at 7. It is true that the statute and regulations require implementation of NAD decisions by local districts. 7 U.S.C. § 7000; 7 C.F.R. § 1900.59(d). 7 C.F.R. § 1900.59(d), however, defines "implementation" as "the next step in a loan processing or loan servicing action, required by [FmHA/FSA] regulations, that would occur had no adverse decision been made and appeal filed." Contrary to plaintiffs' argument, an intermediate step was the issuance of a conditional commitment, as discussed below.

The June 6, 1996 memorandum from the national office to the State Director informing the state office that the appeal would not be reviewed, and the June 17, 1996 memorandum from the State Office to the District Office, stating that the appeal would not be reviewed, are internal FmHA/FSA documents that were not directed to the attention of plaintiffs. Moreover, the June 6, 1996 memorandum directs the State Director to "immediately implement the hearing officer's decision," but goes on to admonish: "This does not mean that the guarantee must be approved." Similarly, the June 17, 1996 memorandum indicates FmHA/FSA's continuing refusal to issue a conditional commitment to the Bank. Finally, the June 7, 1996 Notice of Conclusion of Appeal, like the May 3, 1996 Appeal Determination, orders the FmHA/FSA to implement the hearing officer's decision. None of these communications contains the final terms of the contract.

Instead, the earliest communication that can be characterized as an offer is the May 1, 1998 Conditional Commitment, which the Bank rejected. This conclusion is informed by the Federal Circuit's ruling in *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012 (Fed.Cir.1996). That case dealt with a loan guarantee issued by the FmHA under the Business and Industrial Loan Program, authorized by the same 1972 Act that created the Farmer's Program. Both programs are implemented through 7 C.F.R. pt.1980 and share many of the same governing regulations.

In *Wells Fargo* the Federal Circuit concluded that a contract between FmHA and the lender was created when the conditional commitment was issued: "The Court of Federal Claims correctly ruled that the Conditional Commitment constituted a unilateral contract by which the government agreed to guarantee the loan upon Wells Fargo's performance of the conditions specified, and that Wells Fargo accepted the contract through beginning performance by making the loan." 88 F.3d at 1018. The court did not address

whether a contract could have existed prior to the conditional commitment, but its reasoning is instructive nevertheless. The court focused on language in the conditional commitment, identical to language used in conditional commitments for Farmer's Program loan guarantees, that indicates that the Government is making a binding promise: "[T]he United States of America acting through the Farmers Home Administration (FmHA) hereby agrees that ... it will execute Form(s) FmHA 449–34 'Loan Note Guarantee' subject to the conditions and requirements specified in said regulations and below." *Id.*

Finally, in the instant case, FmHA/FSA's conditional commitment was rejected by the Bank. Instead, the Bank proposed alternative conditions, which were, in turn, rejected by FmHA/FSA. FmHA/FSA then prepared a revised conditional commitment, which was accepted by the bank on October 13, 1998. It is not necessary to identify the precise moment at which the Government bound itself to a contract.[9] It is enough to determine that no contract could have been formed prior to the conditional commitment issued by FmHA/FSA on May 1, 1998. Not only had neither party manifested an intent to be bound to a particular contract, the parties continued to reject each other's terms. Because all the conduct on which plaintiffs rely occurred prior to that date, they cannot sustain a claim for breach of contract.

### 4. Breach based on contract to properly process plaintiffs' application

■ Plaintiffs' complaint can be read to argue that, regardless of whether a contract was formed to provide the loan guarantee, the statute and regulations amount to an offer to consider the application in accordance with the schedule and guidelines in the regulations. "Plaintiff's [sic] submitted a complete and qualified loan application relying upon the Government to act in accor-

dance with it [sic] own regulations ...." Pls.' Br. filed July 9, 2001, at 7. Although the court has concluded that no express agreement existed between the parties concerning the manner in which plaintiffs' application would be processed, plaintiffs' final argument implicates a line of cases dealing with implied-in-fact contracts following *Heyer Prods. Co. v. United States*, 135 Ct.Cl. 63, 140 F.Supp. 409 (1956).

In *Heyer* the plaintiff alleged the bidding procedure followed by the Government was a mere sham to conceal an intention to let the contract to a favored bidder. The plaintiff's was the low bid, but was rejected and the procurement contract was awarded to the seventh lowest bidder. Faced with the question of whether the Court of Claims had jurisdiction over disappointed bidder cases, a majority of the court held: "It was an implied condition of the request for offers that each of them would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted." *Id.* at 69, 140 F.Supp. at 412.

In *Tree Farm*, however, the Court of Claims pointed out that "*Heyer* ... has not been extended beyond the disappointed bidder fact pattern." 218 Ct.Cl. at 318, 585 F.2d at 499. *Tree Farm* is similar to the instant case in that it deals with applications for loan guarantees from the Department of Housing and Urban Development ("HUD"). Plaintiff in that case had filed an application for a loan guarantee that was working its way through the approval process when the Secretary of HUD suspended all consideration of proposals for loan guarantee assistance. Plaintiff argued that the suspension was a "breach of defendant's implied in fact contract to consider plaintiff's application on its merits." *Id.* at 317, 585 F.2d at 498. The Court of Claims rejected this argument, declining to extend *Heyer* to the above facts: "Since plaintiff is not a disappointed bidder, but merely an

---

9. Defendant argues that no contract could have existed prior to October 16, 1998, when the Loan Note Guarantee was issued and the Loan Agreement executed. In particular, defendant relies on 7 C.F.R. §§ 1980.60 and 1980.117, which identify "Conditions precedent to issuance of the Loan Note Guarantee." The Federal Circuit in

*Wells Fargo* rejected an identical argument. Suffice it to say, the conditional commitment, as an offer to enter into a unilateral contract, could have bound the Government prior to the Lender's Certification, the execution of a Loan Agreement, or the issuance of a Loan Note Guarantee.

applicant seeking governmental guarantees of the financing for its proposed development, it is manifest that plaintiff does not fall within the established parameters of the *Heyer* principles as outlined above." *Id.* at 318, 585 F.2d at 499; *see also New Am. Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1080 (Fed.Cir.1989) (noting that *Heyer* has not been extended to imply contract in context of noncompetitive claim for discretionary grant); *El Dorado Springs v. United States,* 28 Fed. Cl. 132, 136–37 (1993) (discussing limits placed on *Heyer* by *Tree Farm* and *New America* ).

Following *Tree Farm,* this court declines to extend *Heyer* to the loan guarantee application at issue in this case. To do so would allow the court's jurisdiction under "any express or implied contract with the United States" to avoid the requirement in *Testan* that suits under a statute or regulation identify a money-mandating provision in order to proceed.

Although this court accepts the conclusion of the Northern District of Texas and the NAD that FmHA/FSA abused its discretion when it decided not to enter into a contract to guarantee plaintiffs' loan, plaintiffs have not alleged that the statutes and regulations that were ignored by FmHA/FSA are in any way money-mandating. Perhaps to avoid the difficulty of making such an argument, plaintiffs argue instead that they can be compensated for FmHA/FSA's failure to follow these provisions because of a contractual duty between them. Consequently, this court's only inquiry is whether a contract was formed, not whether it should have been formed. No such contract was formed when plaintiffs' application was properly filed, because the statute and the regulations cannot be characterized fairly as an offer. Nor do subsequent communications between the parties reveal an offer and an acceptance. The earliest communication that can be considered an offer is the conditional commitment. Finally, the court declines to imply a contract to consider plaintiffs' application under the rule in *Heyer.* Because no contract existed at the time of the Government's misconduct, no action for breach of contract can be maintained.

Defendant's motion for summary judgment as to plaintiffs' first claim for breach of contract is granted.

## II. *Fraud*

Plaintiffs allege that FmHA/FSA's failure and refusal to implement the May 3, 1996 NAD appeal determination, by violating legislation and regulations concerning the loan guarantee program as well as the appeals process, "constitute fraud on plaintiffs." Compl. ¶¶ 14–18, 25. They argue that FmHA/FSA was "contractually bound to follow its own laws, rules, and regulations, and to provide funding and guaranteed loans in accordance with its rules, regulations, and statutes." *Id.* ¶ 14. Moreover, plaintiffs respond to defendant's motion to dismiss by arguing that FmHA/FSA "breached the contract through fraud in obstructing and interfering with the administration of government regulations to implement the final decision of the NAD as well as the judgment of the United States District Court." Pl.'s Br. filed July 9, 2001, at 4. Therefore, according to plaintiffs, "a contractual claim exists with respect to the fraud allegations and the Court should not dismiss the claim for lack of jurisdiction." *Id.*

Plaintiffs rely principally on *Burtt v. United States,* 176 Ct.Cl. 310, 313–14 (1966), in which the plaintiff alleged that she had entered into an oral contract with a member of the Army Medical Corps to receive marriage counseling assistance at an Army hospital. Instead of receiving such assistance at the hospital, the plaintiff claimed that she was involuntarily separated from her three children and confined for treatment as a mental patient. *Burtt* stands for the modest proposition that the Government may breach the terms of a contract through bad faith or tortious conduct and that jurisdiction in the Court of Federal Claims is not precluded simply because the government's conduct has "tortious overtones." *See id.* at 314–15 & n. 4. Although the court can exercise jurisdiction to adjudicate the merits of a claim for tortious breach, the predicate of a breach of contract has not been established in this case. Without an underlying contract on

which a claim for tortious breach can be based, the court cannot consider this claim.

Whether plaintiffs mean to allege that FmHA/FSA has deceived them through false or misleading representations (the traditional definition of "fraud"), or has injured them though their failure to timely follow a relevant law or regulation (as their complaint suggests), their action sounds in tort, not contract, and the court does not have jurisdiction over tort actions against the United States. *See Brown v. United States,* 105 F.3d 621, 623 (Fed.Cir.1997); *Shearin v. United States,* 992 F.2d 1195, 1197 (Fed.Cir. 1993).

Defendant's motion to dismiss plaintiffs' second claim for fraud is denied because the court has jurisdiction to consider the claim for tortious breach of contract, but defendant's motion for summary judgment as to that claim is granted.

III. *Breach of fiduciary duty*

Plaintiff's third claim alleges that FmHA/FSA's "arbitrary and capricious acts constitute breach of fiduciary duty on Plaintiffs." Compl. ¶ 29. Defendant has moved to dismiss this claim on the ground that plaintiffs have failed to identify any fiduciary duty owed to them by FmHA/FSA. Plaintiffs did not respond on point.

■ Plaintiffs identify the conduct they consider a breach of the Government's fiduciary duty, but do not specify from where this duty originates. To be actionable in the Court of Federal Claims, a fiduciary obligation must be premised on a contract or a source of law specified in the Tucker Act which can be interpreted as mandating compensation. In *Mitchell* the Supreme Court recognized a fiduciary duty on the part of the Government to manage Indian timber lands for the benefit of the Indians that was actionable under the Tucker Act: "Because the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." 463 U.S. at 226, 103 S.Ct. 2961;

*see also Begay v. United States,* 16 Cl.Ct. 107, 125 (1987) ("[*Mitchell*] holds that if a statute(s) creates a fiduciary relationship between the United States and Indians then by *implication* that statute(s) may be read as mandating compensation for a breach of the fiduciary duty.").

■ Plaintiffs formulate their claim for breach of fiduciary duty, as follows:

27. The USDA National Appeals Division was created by the Congress to provide a fair, neutral and independent appeal procedure to applicants, participants, borrowers, and recipients of USDA programs and services such as Plaintiffs. It was the intent of Congress that the final decisions of NAD Hearing Officers and officials would be free from interference or obstruction by agency administrative officials or employees.

28. The actions of FmHA/FSA ... violate the intent, purpose and language of the NAD appeals legislation regulations.

29. Such arbitrary and capricious acts constitute breach of fiduciary duty on Plaintiffs.

Compl. ¶¶ 27–29. Plaintiffs' third claim can be read to argue that FmHA/FSA's conduct breached the obligation of good faith and fair dealing owed by every party to a contract. *See* Restatement (Second) of Contracts § 205 (1981). Such a claim properly invokes the court's Tucker Act jurisdiction. However, because any conduct in violation of statutes and rules regarding NAD appeals occurred prior to the formation of a contract between plaintiffs and FmHA/FSA, no contractual fiduciary duty can be maintained.

■ Plaintiffs' third claim can also be understood to allege a fiduciary relationship arising out of the statute and regulations governing NAD appeals determinations. Such an argument again glosses over the fundamental jurisdictional limitations in the Tucker Act. To say that the Government owes a claimant a fiduciary duty does not avoid the question in *Testan*—whether some applicable source of substantive law "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained"; it answers that question.

The statute and regulations regarding NAD appeals do not establish any duty comparable to that described in *Mitchell.* Instead, these provisions set forth a procedure for administrative and judicial review of decisions by USDA officers. The judicial review provision in section 6999, in fact, suggests that the only remedy available to plaintiffs is that obtained by the Bank from the Northern District of Texas—enforcement of the NAD final determination. These provisions do not mandate compensation by the Federal Government, whether directly or through a fiduciary relationship. *See also Harriman v. United States Dep't of Agric.,* 99 F.Supp.2d 105, 108 (D.Me.2000) (holding statutes and regulations governing NAD determinations not money-mandating). Nor do the CFRDA and its implementing regulations establish the Government as a fiduciary to qualified loan applicants. While Congress and the Secretary of Agriculture certainly sought to assist farmers who otherwise could not obtain funds from private lenders, no statute or regulation affords applicants a right to recover money damages from the United States Treasury for the shortcomings of USDA officials administering the program.

Defendant's motion to dismiss plaintiffs' third claim for breach of fiduciary duty for lack of subject matter jurisdiction is granted insofar as plaintiffs assert a fiduciary duty imposed by statute or regulation. Insofar as the alleged duty arises by contract, defendant's motion to dismiss plaintiffs' third claim for breach of fiduciary duty is denied, but defendant's motion for summary judgment as to that claim is granted.

### IV. *Due process*

Plaintiffs' final claim alleges that "Defendant's failure and refusal to implement the NAD Hearing Officer's appeal determination constituted a deprivation of a protected property interest without the due process of law guaranteed by the Fifth Amendment." Compl. ¶ 31. Like their fiduciary duty claim, plaintiffs have not responded to defendant's motion to dismiss their due process claim. The Tucker Act requires that plaintiffs base their claim on a money-mandating provision, even when their claim is based on a provision of the Constitution. *See Testan,* 424 U.S. at 402–03, 96 S.Ct. 948. The Federal Circuit and its predecessor the Court of Claims, however, have consistently held that "no language in the clause itself requires the payment of money damages for its violation." *Murray v. United States,* 817 F.2d 1580, 1583 (Fed.Cir.1987) (citing *Inupiat Cmty. of the Arctic Slope v. United States,* 230 Ct.Cl. 647, 662, 680 F.2d 122, 132 (1982)). Therefore, the due process allegations raised in the plaintiffs' complaint do not present cognizable causes of action.

Defendant's motion to dismiss plaintiffs' fourth claim for violation of due process is granted.

### CONCLUSION

Accordingly, based on the foregoing,

1. Defendant's motion to dismiss plaintiffs' due process claim is granted.

2. Defendant's motion for summary judgment is granted as to plaintiffs' claim for breach of contract, their claim for tortious breach of contract, and any claim for breach of fiduciary duty based on contract.

3. The Clerk of the Court shall enter judgment for defendant on all of plaintiffs' contract claims and dismiss plaintiffs' complaint as to their due process claim without prejudice for lack of jurisdiction.

**IT IS SO ORDERED.**

No costs.